UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————————x

NOSTRUM PHARMACEUTICALS, LLC, and
NOSTRUM LABORATORIES, INC.,

Plaintiffs,

-against-                                           No. 13 Civ. 8718 (CM) (AP)

MANESH DIXIT, Ph.D.,

Defendant.

————————————————————————————x

## MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

McMahon, J.:

Plaintiffs Nostrum Pharmaceuticals, LLC ("NPLLC") and Nostrum Laboratories, Inc.

("NLI," and together with NPLLC, "Nostrum" or the "Companies") brought this action against

Defendant Manesh Dixit, Ph.D., alleging breach of contract, breach of the implied covenant of

good faith and fair dealing, breach of trade secrets laws, breach of fiduciary duty, tortious

interference with contract, and usurpation of business opportunities.

Currently before the Court is Dixit's motion to dismiss under Rule 12(b)(6). For the

following reasons, the motion is granted in part and denied in part.

## BACKGROUND

The following facts are taken from Nostrum's Amended Complaint and are presumed to

be true for purposes of this motion.

### A.    The Parties

Plaintiff NPLLC is a Delaware limited liability company with its principal place of

business in Somerset, New Jersey. (Am. Compl. ¶ 2.)

1

Plaintiff NLI is a New Jersey corporation with its principal place of business in Somerset, New Jersey. (*Id.* ¶ 3.) NLI is a wholly-owned subsidiary of NPLLC. (*Id.*) NLI's manufacturing facilities are located in Missouri. (*Id.* ¶ 9.) The plaintiff corporations formulate and develop generic pharmaceutical drug products. (*Id.* ¶ 4.)

Defendant Dixit is a citizen of Pennsylvania. (*Id.* ¶ 5.) From August 2007 until October 2012, Dixit served as a senior officer of the Companies or one of their predecessor entities. (*Id.* ¶ 5, 9.) Since May 2012, Dixit has served the President and CEO of First Time US Generics, LLC. (*Id.* ¶ 5.)

## B. Dixit's Employment History at Nostrum

Nostrum employed Dixit as a senior officer from August 2007 until October 2012. (Am. Compl. ¶¶ 5, 9.) In that capacity, Dixit managed and oversaw the Companies' research and development of pharmaceutical products, often traveling to India to collaborate with Nostrum's affiliated research facility and technology vendor there. (*Id.* ¶ 11.) Dixit's duties as a Nostrum officer also included drafting patent applications, furnishing initial patent clearances, selecting product formulations, and establishing and operating Nostrum's FDA- and DEA-compliant facilities. (*Id.* ¶ 13.) In performing these duties, Dixit had access to what Nostrum calls its "crown jewels": trade secrets, confidential information, and intellectual property relating to FDA and DEA regulatory approval processes. (*Id.* ¶ 12.)

### 1. The 2010 Employment Agreement

On October 5, 2010, Nostrum and Dixit entered into an employment agreement (the "2010 Employment Agreement"), pursuant to which Dixit was hired as President and Chief Operating Officer of NLI, and Executive Vice President of NPLLC, at a total annual salary of $360,000. (Declaration of Neal DeYoung, ECF No. 24 ("DeYoung Decl."), Ex. C, 2010

2

Employment Agreement, §§ 1-2.)[1] The 2010 Employment Agreement provided that Dixit's employment would continue until September 30, 2011, and would automatically renew each year unless either party provided notice of termination within 60 days of the scheduled termination date, or Dixit was terminated either with or without cause. (*Id.* §§ 1, 10.)

## 2. The 2011 Employment Agreement

On November 1, 2011, Nostrum and Dixit entered into a new employment agreement (the "2011 Employment Agreement"), which canceled and superseded the 2010 Employment Agreement. (DeYoung Decl., Ex. C, 2011 Employment Agreement, Recitations and § 14.) Under this new agreement, Dixit accepted a demotion (to "Vice President-Research and Development" of both NPLLC and NLI) and a pay cut to $300,000/year, from $360,000/year. (*Id.* §§ 1(a), 2(a).) Unlike Dixit's previous contract, the 2011 Employment Agreement did not provide for automatic one-year renewal terms. (*Id.* §§ 1, 10.)

The 2011 Employment Agreement also imposed a number of obligations on Dixit. This lawsuit seeks to enforce those obligations.

### a. Intellectual Property Assignment

Section 5 of the 2011 Employment Agreement (the "Intellectual Property Assignment Provision") provided that any intellectual property developed by Dixit during his employment or within one year after his termination would be owned by Nostrum, as long as the intellectual property in question either (1) "directly or indirectly relates to or arises out of [Dixit's] job responsibilities"; (2) "results from research, development, or other activities" of Nostrum; or (3) "relates or pertains in any way to the existing or reasonable anticipated scope, business or products" of Nostrum. (DeYoung Decl., Ex. C, 2011 Employment Agreement § 5(a).)

---

[1] For some reason, counsel for Dixit chose not to split the 2010 Employment Agreement and the 2011 Employment Agreements into separate exhibits to the DeYoung Declaration. The 2010 Employment Agreement begins about halfway through Exhibit C.

3

This section expressly excluded, however, any "inventions and developments, including but not limited to ideas, that were conceived and recorded by [Dixit] prior to joining such Companies." (*Id.*)

### b. Covenant Not to Disclose

In section 6 of the 2011 Employment Agreement (the "Covenant Not to Disclose"), Dixit agreed that, for a term of five years following the termination of his employment with Nostrum, he would not "communicate, publish or disclose to any person or entity anywhere or use (for [Dixit's] own benefit or the benefit of others) any Confidential Information . . . for any purpose other than carrying out [Dixit's] duties." (DeYoung Decl., Ex. C, 2011 Employment Agreement § 6). The 2011 Employment Agreement defined "Confidential Information" as:

> any information or data used by or belonging or relating to the respective Companies . . . that is not known generally to the industry in which the Companies . . . [are] or may be engaged, including, without limitation, any and all trade secrets, proprietary data and information relating to the respective Companies . . . past, present or future business and products, price lists, customer lists, processes, procedures or standards, know-how, manuals, hardware, software, source code, business strategies, records, marketing plans, drawings, technical information, specifications, designs, patent information, financial information, whether or not reduced to writing, or information or data that the respective Companies . . . advise[] [Dixit] should be treated as confidential information.

(*Id.*) The Covenant Not to Disclose expressly excluded from its scope, however:

> any information that: (i) is rightfully known to [Dixit] prior to [Dixit's] employment, and independent of any disclosure or access to the information via the respective Companies as evidenced by [Dixit's] written records; or (ii) is or later becomes part of the public domain and known within the relevant industry through no fault of [Dixit.]

(*Id.*)

### c. Covenants Not to Compete

Section 8 of the 2011 Employment Agreement contained four separate non-compete clauses (the "Covenants Not to Compete").

4

In section 8(a) (the "Six-Month Non-Compete Clause"), Dixit agreed that during the term

of his employment and for six months thereafter, he would not:

> own, manage, consult with, operate, control or participate in the ownership,
> management, operation or control of, or have any interest, financial or otherwise,
> in or act as an officer, director, partner, principal, member, manager, shareholder,
> proprietor, employee, agent, representative, consultant or independent contractor
> of, or in any way assist any person or entity ("Compete") in the conduct of the
> manufacture, distribution, marketing or sale of pharmaceutical and/or biological
> products in the United States, the conduct or marketing of molecular, chemical or
> pharmaceutical research, analytical or other services and the conduct of any
> business competitive to any business now or at any time while [Dixit] is
> employed by the Companies that is engaged in by the respective Companies or
> any subsidiary, parent or affiliate of the Companies. . . .

(DeYoung Decl., Ex. C, 2011 Employment Agreement § 8(a).)

In section 8(d) (the "Three-Year Non-Compete Clause"), Dixit agreed that during the

term of his employment and for three years thereafter, he would not:

> Compete [as defined above] with or in respect of any products owned, developed
> or to be developed by either of the Companies or its affiliates as to which [Dixit]
> had or shall have any management, research, development, manufacturing or
> other responsibility at any time during his employment with either of the
> Companies.

(*Id.* § 8(d).)

In Section 8(b) (the "One-Year Customer Non-Solicitation Clause"), Dixit agreed that

during the term of his employment and for one year thereafter, he would not:

> solicit or divert or attempt to solicit or divert clients, customers or accounts
> (whether or not such clients, customers or accounts have done business with
> either of the Companies or any subsidiary, parent or affiliate thereof once or more
> than once) of the Companies or any subsidiary, parent or affiliate of the
> Companies.

(*Id.* § 8(b).)

In section 8(c) (the "One-Year Employee Non-Solicitation Clause"), Dixit agreed that

during the term of his employment and for one year thereafter, he would not:

entice, induce or in any manner influence any person who is or shall be in the employ or service of either of the Companies or any subsidiary, parent or affiliate thereof to leave such employ or service.

(*Id.* § 8(c).)

### d. Loyalty Clause

Finally, in section 4 of the 2011 Employment Agreement (the "Loyalty Clause"), Dixit agreed that during the course of his employment with Nostrum, he would "devote [his] best efforts and [his] entire business time to properly further the interests of the Companies." (DeYoung Decl., Ex. C, 2011 Employment Agreement, § 4.)

## C. Dixit's Alleged Breaches of the 2011 Employment Agreement

In May 2012—five months before the 2011 Employment Agreement was scheduled to expire—Dixit allegedly started two new companies, First Time US Generics, LLC, and M Dixit Inc., and "began to engage in direct competition" with Nostrum. (Am. Compl. ¶ 27.) According to the Amended Complaint, in 2012, while still employed by Nostrum, Dixit "devoted considerable time and effort . . . to conduct [*sic*] his own pharmaceutical business," which involved working with "a pharmaceutical company in India and with third parties in the United States." (*Id.* ¶ 33.)

Specifically, Nostrum alleges in the Amended Complaint that, during and shortly following his employment with Nostrum, Dixit and First Time Generics "formulated, developed, manufactured, and tested" various pharmaceutical products, including generic versions of two products: Savella® (milnacipran hydrochloride) and Concerta® (methylphenidate). (*Id.* ¶¶ 34, 36-38, 42.) According to the Amended Complaint, Dixit worked on the research and development of generic versions of these two drugs while he was employed at Nostrum. (*Id.* ¶ 42.)

6

The Amended Complaint also contains allegations that, in addition to Savella® and Concerta®, Dixit and First Time Generics filed Abbreviated New Drug Applications ("ANDAs") with the FDA for three unspecified drugs that are allegedly among the drugs generally described in the following line from Dixit's LinkedIn profile (which is quoted in the Amended Complaint):

> Submitted 3 First-to-File ANDAs for brand drug products currently exceeding total revenue of $700 mil per year. Working on several ANDAs for brand drug products.

(Am Compl. ¶ 40.) Nostrum alleges that the ANDAs for which Dixit filed applications (the "First-to-File ANDAs") were developed using Nostrum's trade secrets and confidential information. (*Id.* ¶ 39.)

Nostrum also alleges in the Amended Complaint that in early 2003, Dixit recruited one of NLI's former employees, Rushi Patel, in violation of both the One-Year Employee Non-Soliciation Clause in Dixit's employment agreement, and the non-disclosure covenant in Patel's employment agreement with Nostrum (the "Patel Agreement"). (*Id.* ¶¶ 48-49.)

On November 19, 2013, Nostrum filed a petition in the New York State Supreme Court, New York County, for pre-complaint discovery under C.P.L.R. § 3102(c). (ECF No. 1-1, at 3.) On December 9, 2013, Dixit removed the action to this Court (ECF No. 1) and filed a motion to dismiss (ECF No. 3) for lack of personal jurisdiction, defective service of process, and failure to state a claim.

Following the parties' initial pre-trial conference with this Court, Nostrum filed a Complaint (ECF No. 9) on January 31, 2014. On February 11, 2014, Dixit filed another motion to dismiss (ECF No. 12); on March 5, 2014, in lieu of a response, Nostrum filed the Amended Complaint (ECF No. 17), in which it asserts claims for (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) common-law misappropriation of trade

secrets, (4) violation of the New Jersey Trade Secrets Act, (5) violation of the Missouri Trade Secrets Act, (6) tortious interference with contract, (7) breach of fiduciary duty, and (8) usurpation of corporate opportunities. On March 19, 2014, Dixit filed the present motion to dismiss (ECF No. 23).

## DISCUSSION

### I.    Standard for Determining the Motion

On a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court assumes the truth of facts asserted in the complaint and draws all reasonable inferences from those facts in favor of the plaintiff. *Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 154 (2d Cir. 2006). To survive a motion to dismiss, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

In deciding a motion to dismiss, the Court may consider the full text of documents that are quoted in or attached to the Complaint, or documents that the plaintiff either possessed or knew about and relied upon in bringing the suit. *Rothman v. Gregor*, 220 F.3d 81, 88-89 (2d Cir. 2000) (citing *Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991)); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d Cir. 1996). The Court may also take judicial notice of "court documents and public records." *Mejia v. New York City Health & Hospitals Corp.*, No. 13-cv-2434 (WHP), 2014 WL 2115109, at *2 (S.D.N.Y. May 19, 2014).

8

## II. Dixit's Motion to Dismiss Plaintiffs' Claim for Breach of Contract (Count 1) Is Denied.

Dixit argues that Nostrum's breach of contract claim fails because the Amended

Complaint does not allege conduct that violates any of four Covenants Not to Compete in the

2011 Employment Agreement. He is incorrect. Because Nostrum has, at the very least,

sufficiently alleged a violation of the Six-Month Non-Compete Clause, Count One survives.

Furthermore, Plaintiffs have arguably stated a claim for breach of the 2011 Employment

Agreement's three-year covenant against competing with Nostrum in connection with products

on which Dixit worked while he was an employee there—products that, at least arguably, and

probably necessarily (given the speed with which Dixit filed his ANDA applications), make use

of Plaintiffs' purported trade secrets.

### A. Nostrum Has Stated a Claim for Breach of the Six-Month Non-Compete Clause.

Dixit's argument that Nostrum has failed to allege a violation of the Six-Month Non-

Compete Clause is based on his creative misquoting of the clause in his motion papers. Instead

of simply block-quoting the clause, as this Court has above, Dixit chose to split its prohibition

into two "subsections":

> (i)     "the conduct of manufacture, distribution, marketing or sale of pharmaceutical and/or biological products in the United States"; *or*
>
> (ii)     "the conduct or marketing of molecular, chemical or pharmaceutical research, analytical or other services and the conduct of any business competitive to any business now or [sic] at any time while Executive is employed by the Companies that is engaged in by the respective Companies or any subsidiary, parent, or affiliate of the Companies."

Def. Mem. at 10 ("[sic]" in original) (emphasis added). The romanette numbering and the word

"or" after the first "subsection" are nowhere to be found in the actual contract, but appear to have

been added by Dixit in an attempt to mislead this Court into accepting his argument that "the

9

conduct . . . of molecular, chemical or pharmaceutical research" is not a breach of the Six-Month

Non-Compete Clause unless such research is "competitive to any business . . . that is engaged in

by the respective Companies or any subsidiary parent, or affiliate of the Companies." *See* Def

Mem. at 10.

The Six-Month Non-Compete Clause, properly read and with no added words, forbids

three separate categories of conduct:

> (1) "the conduct of the manufacture, distribution, marketing or sale of
> pharmaceutical and/or biological products in the United States,"
>
> (2) "the conduct or marketing of molecular, chemical or pharmaceutical
> research, analytical or other services and"
>
> (3) "the conduct of any business competitive to any business now or at any
> time while [Dixit] is employed by the Companies that is engaged in by the
> respective Companies or any subsidiary, parent or affiliate of the
> Companies. . . ."

(DeYoung Decl., Ex. C, 2011 Employment Agreement § 8(a) (numbering and line breaks

added).)

Nostrum has sufficiently stated a claim for breach of the second category (the prohibition

on "the conduct or marketing of . . . pharmaceutical research") by alleging in the Amended

Complaint that (1) Dixit formed First Time Generics in May 2012, five months before ending his

employment at Nostrum; and (2) Dixit and First Time Generics have been "working on the

formulation of, and seeking to manufacture" generic versions of Concerta®, Savella®, and the

drugs listed in the First-to-File ANDAs. (Am. Compl. ¶¶ 27-28, 34, 36-38.) It has also properly

alleged that Dixit has engaged in the conduct of a business competitive with Nostrum's. Dixit's

motion to dismiss this claim is not only without merit; it is frivolous.

10

## B. Nostrum Has Also Stated a Claim for Breach of the Three-Year Non-Compete Clause.

As for the three-year ban on Dixit's competing against Plaintiffs with respect to drugs/products that were in development at Nostrum during his tenure there: Dixit urges that this claim must be dismissed because a three-year covenant-not-to-compete is unreasonable under New York law. But New York law does not set any time limit on the theft of trade secrets by a faithless employee—especially one who set up his business while allegedly still employed by Plaintiffs and owing them a duty of loyalty. Instead, New York courts will find a covenant not to compete to be reasonable "only if it: (1) is *no greater* than is required for the protection of the *legitimate interest* of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388-89 (1999). This intensely fact-based test is not one that lends itself to resolution on a motion to dismiss.

Moreover, while the 2011 Employment Agreement called this a "non-competition" agreement, fairly read, the Three-Year Non-Compete Clause is actually a prohibition against using trade secrets during the period when those secrets could most profitably be employed by Plaintiffs—or against them. Although Dixit objects to the "worldwide and unlimited" nature of the Three-Year Non-Compete Clause, Def. Mem. at 15, the clause is *not* a prohibition against all employment, or even all employment in the generic drug industry. No New York case cited by Dixit suggests that a three-year bar on competing with respect to the specific products on which Nostrum worked is *per se* unreasonable. It may turn out to be unreasonable, but it is not unreasonable as a matter of law; therefore, the claim cannot be dismissed.

In the alternative, Dixit argues that the 2011 Employment Agreement "expressly permits" him to work on Concerta® (methylphenidate) because he "worked on and published a patent about a generic version of Concerta® long before he was ever employed by Nostrum." Def

11

Mem. at 11. It is true that section 5(a) of the 2011 Employment Agreement excludes from the agreement's *intellectual property assignment* provision "inventions and developments . . . that were conceived and recorded by [Dixit] prior to joining [the] Companies," and section 6 of the 2011 Employment Agreement excludes from its *confidentiality* provision any information that is "rightfully known to [Dixit] prior to [his] employment, and independent of any disclosure or access to the information via the respective Companies." (DeYoung Decl., Ex. C, 2011 Employment Agreement, §§ 5(a), 6.) But neither of these sections "expressly permits" Dixit to do anything; they simply confirm that Nostrum does not own, and Dixit is free to disclose, intellectual property and information that he developed and possessed prior to his employment. And in any event, whether the generic formulation of Concerta® that Dixit developed at First Time Generics falls within this carve-out (that is, whether its development involved the use of Nostrum trade secrets, or only of Dixit's pre-Nostrum intellectual property) is a question of fact that cannot be resolved on a pre-answer motion.

Finally, Dixit argues that Nostrum's claim for breach of the Three-Year Non-Compete Clause fails as to Dixit's work on a generic version of Savella® (milnacipran hydrochloride). This is so, Dixit claims, because the Amended Complaint's allegation that Nostrum "previously considered developing" a generic form of Savella® (Am. Compl. ¶ 38) is not enough to state a claim for breach of the Three-Year Non-Compete Clause's prohibition against competition with respect to "any products owned, developed, or *to be developed* by either of the Companies." (DeYoung Decl., Ex. C, 2011 Employment Agreement, § 8(d) (emphasis added).) This is pure sophistry. On any fair reading of the Amended Complaint, Plaintiffs have alleged that Savella® was a product "to be developed" by Nostrum, and have therefore stated a claim for breach of the Three-Year Non-Compete Clause as to Dixit's generic formulation of Savella®.

12

Dixit's motion to dismiss Nostrum's breach of contract claim is denied.[2]

### III. Dixit's Motion to Dismiss Plaintiffs' Claims for Breach of the Implied Covenant of Good Faith and Fair Dealing (Count 2) Is Granted.

Dixit argues that Nostrum's claim for breach of the implied covenant of good faith and fair dealing should be dismissed as duplicative of its breach of contract claim. The Court agrees.

Under New York law, there is a covenant of good faith and fair dealing implied in all contracts. *See 511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (N.Y. 2002); *Carvel Corp. v. Diversified Mgmt. Grp.*, 930 F.2d 228, 230 (2d Cir. 1991). "This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002). The implied covenant encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Manhattan Motorcars, Inc. v. Automobili Lamborghini*, 244 F.R.D. 204 (S.D.N.Y. 2007) (internal quotation marks omitted).

To avoid redundancy, "Claims of breach of the implied covenant . . . must be premised on a different set of facts from those underlying a claim for breach of contract." *Deutsche Bank Sec. Inc. v. Rhodes*, 578 F. Supp. 2d 652, 664 (S.D.N.Y. 2008). "A party may maintain a claim for breach of the implied covenant only if the claim is based on allegations different from the allegations underlying the accompanying breach of contract claim." *Id.* Accordingly, "when a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013).

---

[2] Dixit's motion to dismiss does not suggest that Nostrum's claims for breach of either the One-Year Employee Non-Solicitation Clause or the Loyalty Clause are in any way deficient. Therefore, these claims will proceed as well.

13

Here, Nostrum claim for breach of the implied covenant is based on the same facts as its express breach of contract claim: Dixit's "creation of his own generic drug companies." (Am. Compl. ¶ 58.) Nostrum argues that this conduct also violated "fiduciary, employment and other obligations that extended beyond the contractual duties set forth in the Agreements themselves," Pl. Opp. at 17, but ignores section 4 of the 2011 Employment Agreement, which specifically required Dixit to "devote [his] best efforts and [his] entire business time to properly further the interests of the Companies." (DeYoung Decl., Ex. C, 2011 Employment Agreement, § 4.)

The Amended Complaint also alleges that Dixit breached the implied covenant because he "intentionally and deliberately acted and proceeded in bad faith." (Am. Compl. ¶ 57.) But New York, unlike other jurisdictions, does not recognize "bad faith" as an extra element distinguishing an implied-covenant claim from a breach-of-contract claim. *See U.S. Bank Nat. Ass'n ex rel. Lima Acquisition LP v. PHL Variable Ins. Co.*, No. 12-cv-6811 (CM) (JCF), 2014 WL 998358, at *7-8 (S.D.N.Y. Mar. 14, 2014).

Dixit's motion to dismiss Nostrum's claim for breach of the implied covenant of good faith and fair dealing is granted, and Count Two of the Amended Complaint is dismissed with prejudice.

## IV. Dixit's Motion to Dismiss Plaintiffs' Claims for Misappropriation of Trade Secrets (Counts 3, 4 & 5) Is Denied.

Counts Three, Four, and Five of the Amended Complaint set forth claims for misappropriation of trade secrets under New York, New Jersey, and Missouri law, respectively. Because the choice-of-law issue presented by these multiple claims is not yet ripe for decision, and because Dixit has failed to show that Nostrum's New York common-law misappropriation claim should be dismissed on the merits, Dixit's motion to dismiss these claims is denied.

14

## A. Dixit's Motion to Dismiss Nostrum's Claims Under the New Jersey and Missouri Trade Secrets Acts (Counts 4 & 5) Is Denied As Premature.

Where, as here, a plaintiff's complaint invokes federal diversity jurisdiction, courts apply

the choice-of-law rules of the forum state—here, New York. *See Fin. One Pub. Co. Ltd. v.*

*Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005). Because New Jersey and

Missouri have each adopted a version of the Uniform Trade Secrets Act, and New York has not,

the choice of which state's law to apply will make a difference in the Court's analysis of

Nostrum's trade-secret claim. *Cf. Bulldog New York LLC v. Pepsico, Inc.*, No. 08-cv-1110

(AWT), 2014 WL 1284903, at *6 (D. Conn. Mar. 31, 2014). If Missouri trade-secrets law

applies, Nostrum's common-law claims for breach of fiduciary duty, tortious interference with

contract, and usurpation of corporate opportunities will be preempted. *See* MO. ANN. STAT.

§ 417.463. The recently adopted New Jersey Trade Secrets Act, however, does not preempt

these common-law remedies. *See* N.J. STAT. ANN. § 56:15-9(a). Thus, an actual conflict of law

exists for these counts.

Although the 2011 Employment Agreement specifies that it "shall be governed by,

construed, interpreted, and enforced in accordance with the laws of the State of New York,"

(DeYoung Decl., Ex. C, 2011 Employment Agreement, § 21(a)), "New York courts are reluctant

to construe choice-of-law provisions broadly to encompass non-contractual claims." *Innovative*

*BioDefense, Inc. v. VSP Technologies, Inc.*, 12-cv-3710 (ER), 2013 WL 3389008, at *4

(S.D.N.Y. July 3, 2013) (quoting *Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.,* 414

F.3d 325, 334–35 (2d Cir. 2005)). Accordingly, under New York law, for a choice-of-law

provision to apply to a tort claim arising incident to the contract, the express language of the

provision must be "sufficiently broad" so as to encompass the entire relationship between the

contracting parties. *Krockv. Lipsay,* 97 F.3d 640, 645 (2d Cir. 1996). New York courts have

15

consistently held that language that the "agreement itself" is to be governed by a particular law is too narrow to cover non-contractual claims, *see, e.g.*, *Williams v. Deutsche Bank Sec., Inc.,* No. 04-cv-7588 (GEL), 2005 WL 1414435, at *5 (S.D.N.Y. June 13, 2005), and that in order to achieve broad coverage, parties should utilize choice-of-law provisions that "employ expansive language such as 'arising out of or relating to' the contract or 'arising directly or indirectly from the Agreement.'" *Frazer Exton Dev., LP v. Kemper Envtl., Ltd.,* No. 03-cv-0637 (HB), 2004 WL 1752580, at *10 (S.D.N.Y. July 29, 2004).

Here, the 2011 Employment Agreement's language is insufficiently broad to cover the Amended Complaint's tort-based claims:

> This Agreement and all rights and obligations of the Parties hereunder shall be governed by, construed, interpreted and enforced in accordance with the laws of the State of New York applicable to agreements made and to be performed entirely within the State, including all matters of enforcement, validity and performance.

(DeYoung Decl., Ex. C, 2011 Employment Agreement, § 21(a)). *See Innovative BioDefense,* 2013 WL 3389008, at *5 (construing substantially similar language).

The next step, then, would be to perform the choice-of-law analysis. In tort actions, New York courts apply an "interest analysis," under which the law of the jurisdiction having the greatest interest in the litigation is applied. *AroChem Int'l, Inc. v. Buirkle,* 968 F.2d 266, 270 (2d Cir. 1992); *see also Babcock v. Jackson,* 12 N.Y.2d 473, 481 (1963). In trade secret cases, the Second Circuit and its district courts have often used the locus of the misappropriation to determine the locus of the tort and the state with the greatest interest. *See, e.g.*, *Sarkissian Mason, Inc. v. Enter. Holdings, Inc.*, 955 F. Supp. 2d 247, 254 (S.D.N.Y. 2013); *Fedders Corp. v. Haier Am. Trading, LLC,* No. 00-cv-5583 (JSM), 2002 WL 519733 (S.D.N.Y. Apr. 4, 2002).

Unsurprisingly, both *Sarkissian Mason* and *Fedders* were decided on motions for summary judgment, not motions to dismiss. Here, in the case's current posture, the record is too

16

sparse for the Court to decide whether the trade-secrets laws of New Jersey (where both Nostrum corporations have their principal places of business, and where NLI is incorporated), Missouri (where NLI operates its manufacturing facilities, where the principal office of First Time Generics is located, and where Dixit lived when he served as a Nostrum officer), or New York (whose law the parties chose to govern their contract) should apply. Dixit's motion to dismiss Counts Four and Five of the Amended Complaint is denied.[3]

## B. Dixit's Motion to Dismiss Plaintiffs' Claim for New York Common-Law Misappropriation of Trade Secrets (Count 3) Is Denied.

Despite the choice-of-law issues raised by the Amended Complaint, Dixit also urges dismissal on the merits of Nostrum's common-law claim for misappropriation of trade secrets, arguing that the Amended Complaint contains insufficient factual allegations to sustain the claim under New York law. The Court disagrees.

To succeed on a claim for the misappropriation of trade secrets in New York, a party must demonstrate that (1) it possessed a trade secret, and (2) the defendants used that trade secret "in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *Medtech Products Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 787 (S.D.N.Y. 2008) (quoting *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43-44 (2d Cir. 1999)). The New York Court of Appeals has defined a "trade secret" as "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity

---

[3] After arguing in his opening brief that the Amended Complaint "provides no factual basis for applying" the Missouri or New Jersey Trade Secret Acts, Def. Mem. at 21, Dixit does an about-face in his reply brief and argues for the first time that Missouri trade-secrets law should apply. Def. Reply at 7-8. Dixit's change of heart (or, more likely, his realization that the Missouri Trade Secrets Act would preempt Nostrum's other common-law claims) comes too late; I will not consider this belatedly raised argument. *See, e.g., In re OSG Sec. Litig.*, No. 12-cv-7948 (SAS), 2014 WL 1678915 (S.D.N.Y. Apr. 28, 2014) ("Because defendants raise these arguments for the first time on reply, they need not be considered.").

17

to obtain an advantage over competitors who do not know or use it." *Ashland Mgmt. Inc. v. Janien*, 82 N.Y.2d 395, 407 (1993) (quoting Restatement of Torts § 757, cmt. b (1939)).

The Amended Complaint alleges that Dixit misappropriated Nostrum's trade secrets in connection with (1) the manufacturing process and formulation for a generic version of Concerta® (methylphendiate); (2) the manufacturing process for a generic version of Savella® (milnacipran); and (3) the manufacturing process for "one or more of the First to File ANDA-related products referred to in Dixit's LinkedIn profile." (Am. Compl. ¶¶ 34-47.)

First, Dixit argues that Nostrum's trade-secret claims with respect to Concerta® fail because the Amended Complaint "does not suggest that Dr. Dixit successfully developed a generic version of this drug." Def. Mem. at 19. But Dixit points to no authority, and the Court is aware of none, holding that a trade-secret defendant must be *successful* in order to have "used" the plaintiff's trade secret. And as Nostrum points out, a trade-secret plaintiff in New York "must plead facts sufficient to raise an inference that a defendant improperly used a trade secret, but need not specifically plead that the defendant used the trade secrets." *Balance Point Divorce Funding, LLC v. Scrantom*, 978 F. Supp. 2d 341, 353 (S.D.N.Y. 2013). Here, the Amended Complaint's allegation that Dixit "has been working on the formulation of, and seeking to manufacture a generic form of Concerta® (methylphenidate) which is a product that was, and is, in the process of development and manufacture by Plaintiffs," (Am. Compl. ¶ 34), is sufficient.

In the alternative, Dixit argues that the 2011 Employment Agreement "expressly permits" him to work on generic formulations of Concerta®, "a drug that [Dixit] worked on as an inventor and patentee before joining employment with Nostrum." Def. Mem. at 19. But as noted above, whether the generic formulation of Concerta® that Dixit developed at First Time Generics falls within this carve-out (that is, whether its development involved the use of Nostrum trade secrets,

or only of Dixit's pre-Nostrum intellectual property) is a question of fact that cannot be resolved on the current motion.

Next, Dixit argues that Nostrum's claim for misappropriation of its trade secrets in connection with Savella® fails because the Amended Complaint does not sufficiently allege the existence of a trade secret. This is so, Dixit argues, because the Amended Complaint states only that Savella® was a drug "the development of which Plaintiffs had *previously considered* developing [*sic*] themselves." (Am. Compl. ¶¶ 38, 41 (emphasis added).) But the Amended Complaint also alleges that Dixit (1) "conducted or oversaw the research, development and manufacture" of a generic form Savella® while he was a Nostrum officer, and (2) filed an ANDA with the FDA for a generic formulation of the drug shortly after leaving to form First Time Generics. (*Id.* ¶¶ 41-42.) These allegations are sufficient to state a claim.

Finally, Dixit argues that Nostrum's trade-secret claims in connection with the other "First to File ANDA-related products" is "based on nothing but rank speculation." Def. Mem. at 18. This myopic reading of the Amended Complaint ignores its allegations that (1) the First-to-File ANDAs were for "generic formulations" of "brand drug products" (Am. Compl. ¶¶ 37, 40), and (2) they were filed within a year of Dixit's departure from Nostrum, despite the fact that ANDA filings typically require years of lead-up research and testing. (*Id.* ¶¶ 40-45.) At this stage of the litigation, Nostrum's allegations are sufficient to raise an inference that Dixit improperly used the Companies' trade secrets. *See Balance Point*, 978 F. Supp. 2d at 353.

Dixit's motion to dismiss Nostrum's claim for misappropriation of trade secrets is denied.

## V.     Dixit's Motion to Dismiss Plaintiffs' Claim for Tortious Interference with Contract (Count 6) Is Denied.

Dixit argues that the Amended Complaint fails to state a claim for tortious interference with contract. The Court disagrees.

19

In New York, to state a claim for tortious interference with contract, a plaintiff must allege: "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006) (internal quotation marks omitted)

Here, Nostrum's claim is based on Dixit's alleged recruitment of Rushi Patel, an NLI employee, and Patel's subsequent breach of his own non-disclosure agreement with NLI. (*See* Am. Compl. ¶¶ 48-50.) Dixit argues that this claim fails because the Amended Complaint "does not allege whether Patel was employed by Nostrum at the time of the alleged solicitation." Def. Mem. at 16. Dixit misreads the Amended Complaint. Although paragraph 48 does ambiguously refer to Patel as "one of plaintiff NLI's *former* employees," it goes on to allege that Dixit "succeeded in recruiting [Patel] . . . *from Plaintiffs' employment*." (Am. Compl. ¶ 48 (emphases added).) Paragraph 48 clearly alleges that Patel was an NLI employee at the time of Dixit's alleged solicitation.

In the alternative, Dixit argues that Nostrum's tortious-interference claim fails because Nostrum has not alleged that Patel actually breached his employment agreement with Nostrum. But in paragraph 50, the Amended Complaint specifically alleges that Patel performed "pharmaceutical research and development work with Dixit and First Time Generics relating to essentially the same trade secrets and confidential information of Plaintiffs' referred to above which Dixit himself has misappropriated." (Am. Compl. ¶ 50.) Fairly read, this paragraph alleges that in the course of performing this pharmaceutical research for Dixit and First Time Generics, Patel breached his non-disclosure agreement.

20

Finally, Dixit argues that Nostrum's claim fails because the Amended Complaint does not specifically allege that Dixit had actual knowledge of Patel's employment agreement with NLI. But the Amended Complaint does contain specific allegations that (1) Dixit served as a senior officer of both NLI and NPLLC from August 2007 until October 2012 (*Id.* ¶ 11); and (2) given the intimate knowledge of Nostrum's business that this position afforded him, he "knew, or should have known, of the existence of the Patel Agreement." (*Id.* ¶ 50.) The fair implication of these factual allegations is that as senior executive of the Companies, Dixit was aware of Nostrum's policy of requiring its employees to sign contracts containing non-disclosure agreements (as his own contract did).

Dixit's motion to dismiss Nostrum's tortious-interference claim is denied.

## VI. Dixit's Motion to Dismiss Plaintiffs' Claim for Breach of Fiduciary Duty (Count 7) Is Denied.

Dixit argues that Nostrum's claim for breach of fiduciary duty should be dismissed as duplicative of its breach of contract claim. The Court disagrees.

Under New York law, claims of fraud and breach of fiduciary duty that merely duplicate contract claims must be dismissed. *See, e.g.*, *William Kaufman Org., Ltd. v. Graham & James LLP*, 703 N.Y.S.2d 439, 442 (1st Dep't 2000); *Morgan v. A.O. Smith Corp.*, 697 N.Y.S.2d 152, 152 (2d Dep't 1999). Conduct constituting a breach of contract may nevertheless actionable in tort, however, if "a legal duty independent of the contract itself has been violated." *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 389 (1987). "Such a duty may be independent of a contract and yet emerge from a relationship of trust and confidence created by a contract, as in the case of a lawyer and client." *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC.*, 376 F. Supp. 2d 385, 408 (S.D.N.Y. 2005). In other words, "the same conduct which may constitute the breach of a contractual obligation may also constitute the breach of a duty arising

21

out of the relationship created by contract but which is independent of the contract itself." *Id.*
(quoting *Mandelblatt v. Devon Stores*, 521 N.Y.S.2d 672, 676 (1st Dep't 1987)); *see Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996).

Here, Nostrum's claim for breach of fiduciary duty is based, at least in part, on conduct other than that complained of in the breach-of-contract claim. Specifically, the Amended Complaint alleges that Dixit breached his fiduciary duties by, "Misleading plaintiffs as to his purpose and motivations for certain business development activities, his employment termination arrangements and agreements, and engaging in self-dealing, while employed as a corporate or executive officer of Plaintiffs and while purportedly acting as an agent of Plaintiffs." (Am. Comp. ¶ 85(a).) This conduct goes beyond even that proscribed by section 4 of the 2011 Employment Agreement, which requires Dixit to "devote [his] best efforts and [his] entire business time to properly further the interests of the Companies." (DeYoung Decl., Ex. C, 2011 Employment Agreement, § 4.). These allegations render Nostrum's claim for breach of fiduciary duty non-duplicative.

Dixit's motion to dismiss Nostrum's breach of fiduciary duty claim is denied.

## VII. Dixit's Motion to Dismiss Plaintiffs' Claim for Usurpation of Corporate Opportunity (Count 8) Is Denied.

Dixit argues that the Amended Complaint fails to state a claim for usurpation of corporate opportunity. The Court disagrees.

"The doctrine of 'corporate opportunity' provides that corporate fiduciaries and employees cannot, without consent, divert and exploit for their own benefit any opportunity that should be deemed an asset of the corporation." *Alexander & Alexander of New York, Inc. v. Fritzen*, 542 N.Y.S.2d 530, 533 (1st Dep't 1989). New York courts only apply this doctrine, however, where either (1) the corporation has an "interest" or "tangible expectancy" in the

22

opportunity, *Am. Fed. Grp., Ltd. v. Rotherberg*, No. 91-cv-7860 (THK), 2003 WL 22349673, at \*12 (S.D.N.Y. Oct. 14, 2003); or (2) the opportunity is the same as, or is "necessary" for, or "essential" to, the line of business of the corporation, and "the consequences of deprivation are so severe as to threaten the viability of the enterprise." *Design Strategies, Inc. v. Davis*, 384 F. Supp. 2d 649, 6772 (S.D.N.Y. 2005) (quoting *Alexander*, 542 N.Y.S.2d at 534-35). Courts have defined a "tangible expectancy" as "something much more less tenable than ownership, but, on the other hand, more certain than a desire or a hope." *Corporate Interiors, Inc. v. Pappas*, 784 N.Y.S.2d 919 (Sup. Ct. Queens Co. 2004) (quoting *Alexander*, 542 N.Y.S.2d at 534).

Here, Nostrum has sufficiently alleged the existence of protectable corporate opportunities. In the Amended Complaint and its motion papers, Nostrum points to the generic formulations of Concerta® and Savella®, as well as Dixit's other First-to-File ANDAs, and argues that Dixit's research and development of "various formulations and products in Plaintiffs' line of business" amounts to usurpation of Nostrum's corporate opportunities. (*See* Am. Compl. ¶ 90; Pl. Opp. at 28.) The questions of whether Dixit's own generic formulations of these drugs employed Nostrum's trade secrets, and how many generic drugs can be developed economically at a given time using the same or substantially similar formulations, are fact-intensive issues that cannot be resolved at this stage of the litigation. It may be that this claim will not survive until trial, but it cannot be disposed of on a motion to dismiss.

Dixit's motion to dismiss Plaintiffs' claim for usurpation of corporate opportunity is denied.

23

**CONCLUSION**

For the foregoing reasons, Dixit's motion to dismiss is granted in part and denied in part. Count Two of the Amended Complaint is dismissed with prejudice; all other claims will go forward. The Clerk of the Court is directed to remove Docket No. 23 from the Court's list of pending motions.

Dated: September 2, 2014

_____
U.S.D.J.

BY ECF TO ALL COUNSEL