UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————————x

NOSTRUM PHARMACEUTICALS, LLC, and
NOSTRUM LABORATORIES, INC.,

        Plaintiffs,

    -against-

MANESH DIXIT,

        Defendant.

——————————————————————————x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/23/16

No. 13-cv-8718 (CM)

## MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART CROSS-MOTIONS FOR SUMMARY JUDGEMENT

McMahon, C.J.:

Plaintiffs Nostrum Pharmaceuticals, LLC ("NPLLC") and Nostrum Laboratories, Inc. ("NLI" and together with NPLLC, "Nostrum" or the "Companies") brings this action against a former employee, Defendant Manesh Dixit, for breach of contract, misappropriation of trade secrets, and other violations of New York State law. According to Plaintiffs, Defendant breached various covenants in his employment agreement by launching a pharmaceutical company that competed with Plaintiffs in the development of generic pharmaceutical products and using Plaintiffs' confidential information and trade secrets. Currently before the Court are the parties' cross-motions for summary judgment on several of Plaintiffs' claims and all of Defendant's affirmative defenses. The motions are granted in part and denied in part.

### BACKGROUND

NPLLC, a Delaware limited liability company, and NLI, a New Jersey corporation, manufacture, market, and sell generic pharmaceutical drug products throughout the United States. (Statement of Pls.' in Opp'n to Def.'s Local Civ. R. 56.1 Statement of Undisputed Facts

1

(Dkt. No. 223) ("Pls.' Rule 56.1 Counterstatement") ¶¶ 1-2; Def.'s Response to Pls.' Local Civ. R. 56.1 Statement and Counter-Statement of Material Facts (Dkt. No 223) ("Def's Rule 56.1 Counterstatement") ¶ 3.) Nostrum's principal offices are in New Jersey. (Pls.' Rule 56.1 Counterstatement ¶1.)

Dixit, a Pennsylvania citizen, worked for Nostrum in its Kansas City, Missouri facility from August 28, 2007 through October 31, 2012. (*Id.* ¶ 5.) Dixit managed and oversaw the research and development of pharmaceutical products; his responsibilities including formulating, testing, and manufacturing pharmaceutical products, as well as filing abbreviated New Drug Applications ("ANDAs") with the Federal Food and Drug Administration ("FDA") to seek approved to sell generic versions of existing licensed or approved pharmaceuticals. (*Id.* ¶¶ 12-13.) Dixit regularly traveled to Mumbai, India, to visit Enem Nostrum Remedies Pvt. Ltd. ("Enem"), a facility affiliated with Nostrum, and to New York, New Jersey, Maryland, and Florida to meet with Nostrum executives and regulators and to conduct due diligence on pharmaceutical manufacturers. (*Id.* ¶ 20.)[1] Dixit reported to Nirmal Mulye, the President of NPLLC and Chief Executive Officer of NLI. (*Id.* ¶ 11.)

---

[1] Defendant disputes several of Plaintiffs' statements of undisputed facts on the sole basis that they are "conclusory statements based on an identical conclusory statement contained in the Mulye Declaration without any reference to admissible evidence." (*See, e.g.,* Def's Rule 56.1 Counterstatement ¶ 4.) This is not a valid ground on which to dispute Plaintiffs' statements. A sworn declaration submitted by the Plaintiffs' President and CEO is admissible as testimonial evidence and can be introduced as evidence to support Plaintiffs' contentions. The fact that the President and CEO's statements are conclusory and not supported by other evidence may result in the fact finder's determining that they are not credible. However, the Court may consider them on a motion for summary judgment as evidence in support of Plaintiffs' position. To the extent that Defendant has not disputed Mulye's assertions with their own admissible evidence, those assertions are deemed admitted for purposes of this motion.

2

Dixit holds a Ph.D. in pharmaceuticals from the Ohio State University and worked as a patent agent and research scientist at other pharmaceutical companies before joining Nostrum. (*Id.* ¶ 12.)

A. Employment Contracts

Dixit signed three employment agreements while employed by Nostrum. The first, dated August 28, 2007 (the "2007 Employment Agreement"), gave Dixit the title of Vice President R&D of Nostrum Pharmaceuticals, Inc., a precursor to Nostrum, and set his base salary at $180,000 per year. It stated that Dixit would be employed by Nostrum Pharmaceuticals, Inc., until May 31, 2009, but that his employment would automatically renew for two-year terms unless one of the parties provided notice of termination within 60 days of the scheduled termination date or Dixit was terminated with or without cause. (Decl. of Nirmal Mulye (Dkt. No. 206) ("Mulye Decl.") Exh. B.) The second, dated October 5, 2010 (the "2010 Employment Agreement"), canceled and superseded the 2007 Employment Agreement, gave Dixit the titles of President and Chief Operating Office ("COO") of NLI and Executive Vice President of NPLLC, and set his salary at $360,000 per year. It stated that Dixit would be employed by Nostrum for a term ending September 30, 2011, but that his employment would automatically renew for one-year terms unless one of the parties provided notice of termination within 60 days of the scheduled termination date or Dixit was terminated with or without cause. (Mulye Decl. Exh. C.)

The third employment agreement, the Amended and Restated Employment Agreement dated November 1, 2011 (the "2011 Employment Agreement"), canceled and superseded the 2010 Employment Agreement. Pursuant to the terms of this new agreement, Dixit accepted a demotion (to Vice President-Research and Development of both NPLLC and NLI) and a reduction in pay (from $360,000 per year to $300,000 per year). (Decl. of Neal A. DeYoung ISO

3

Def.'s Mot. for Summ. J. (Dkt. No. 212) ("DeYoung Decl.") Ex. F, §§ l(a), 2(a).) The 2011

Employment Agreement stated that Dixit would be employed by Nostrum for a term that ended

on October 31, 2012. Unlike 2010 Employment Agreement, the 2011 Employment Agreement

did not provide for automatic one-year renewal. (*Id.* §§ 1, 10.)

The 2011 Agreement contained restrictive covenants, several of which are at issue in this

case. Section 5, which covered disclosure and assignment of intellectual property, stated in

relevant part:

(a) Executive agrees that the Companies shall become the owner, as the case may be, of all inventions, discoveries, developments, ideas, writings, and expressions, including but not limited to any and all concepts, improvements, techniques, know-how, innovations, systems, processes, machines, current or proposed products, works, information, reports, papers, logos, computer programs, designs, marketing materials, and methods of manufacture, distribution, management or other methods (whether or not reduced to writing and whether or not patentable or protectable by copyright), that Executive conceives, develops, creates, makes, perfects or reduces to practice in whole or in part while employed by such Companies or within one (1) year after termination of Executive's employment for such Companies for any or no reason, and that:

   (i)    directly or indirectly relates to or arises out of Executive's job responsibilities for such Companies or the performance of the duties of Executive's employment by such Companies;

   (ii)   results from research, development, or other activities of such Companies; or

   (iii)  relates or pertains in any way to the existing or reasonably anticipated scope, business or products of such Companies or any subsidiary, parent or affiliate of such Companies (hereinafter the "Intellectual Property").

All of the right, title and interest in and to the Intellectual Property shall become exclusively owned by the Companies, . . . regardless of whether or not the conception, development, creation, making, perfection or reduction to practice of such Intellectual Property involved the use of the Companies' respective time, facilities or materials and regardless of where such Intellectual Property may be conceived, made or perfected. . . .

(DeYoung Decl. Exh. F § 5.)

4

Section 6, which contained a covenant not to disclose confidential information, retain

confidential information, or misuse Confidential Information, states in relevant part:

> Executive hereby agrees and acknowledges that Executive owes a duty to the Companies
> not to disclose, and agrees that, during and for five (5) years after the term of Executive's
> employment by the Companies, without the prior written consent of the Companies,
> **Executive will not communicate, publish or disclose to any person or entity**
> **anywhere or use (for Executive's own benefit or the benefit of others) any**
> **Confidential Information (as defined below) for any purpose other than carrying**
> **out Executive's duties as contemplated by this Agreement. . . . Executive will return**
> **to the respective Companies all originals and copies of documents and other**
> **materials,** whether in printed or electronic format or otherwise, containing or derived
> from Confidential Information in Executive's possession or under Executive's control . . .
> and in any event will return all Confidential Information within ten (10) days if
> Executive's employment is terminated for any or no reason and **will not retain any**
> **copies thereof.** Executive acknowledges that Executive is obligated to protect the
> Confidential Information from disclosure or use even after termination of Executive's
> employment by the Companies. For the purposes thereof, the term "Confidential
> Information" shall mean any information or data used by or belonging or relating to the
> respective Companies . . . that is not known generally to the industry in which the
> Companies . . . may be engaged, including, without limitation, any and all trade secrets,
> proprietary data and information relating to . . . past, present or future business and
> products, price lists, customer lists, processes, procedures or standards, know-how,
> manuals, hardware, software, source code, business strategies . . . whether or not reduced
> to writing . . . . Confidential Information does not include any information that: . . . (ii) is
> or later becomes part of the public domain and known within the relevant industry
> through no fault of Executive.

(*Id.* § 6.)

Section 8, which contained three separate non-compete and non-solicitation covenants,

states in relevant part:

> Executive agrees that Executive will not, directly or indirectly, without the express
> written consent of the Companies except when and as requested to do in and about the
> performance of Executive's duties under this Agreement:
>
> (a) during the Term of Employment and for a period of **six (6) months** from and after the
> voluntary or involuntary termination of such employment for any or no reason, **own,**
> **manage, consult with, operate, control or participate in the ownership,**
> **management, operation or control of,** or have any interest, financial or otherwise,
> in or act as an officer, director, partner, principal, member, manager, shareholder,
> proprietor, employee, agent, representative, **consultant or independent contractor**
> **of, or in any way assist any person or entity ("Compete") in the conduct of the**

5

**manufacture, distribution, marketing or sale of pharmaceutical and/or biological products in the United States,** the conduct or marketing of molecular, chemical or pharmaceutical research, analytical or other services and the conduct of any business competitive to any business now or at any time while Executive is employed by the Companies that is engaged in by the respective Companies or any subsidiary, parent or affiliate of the Companies . . . .

(c) during the Term of Employment and for a period of **one (I) year** from and after the voluntary or involuntary termination of such employment for any or no reason, **entice, induce or in any manner influence any person who is or shall be in the employ or service of either of the Companies or any subsidiary, parent or affiliate thereof to leave such employ or service;** or

(d) during the Term of Employment and for a period of **three (3) years** from and after the voluntary or involuntary termination of such employment for any or no reason, **Compete with or in respect of any products owned, developed or to be developed by either of the Companies or its affiliates as to which Executive had or shall have any management, research, development, manufacturing or other responsibility at any time during his employment with either of the Companies.**

(*Id.* § 8.)

B. Alleged Trade Secret Misappropriation

In the second amended complaint, Plaintiffs pleaded claims based on four

pharmaceuticals. They added two more during the course of discovery. At this juncture, though,

Plaintiffs appear to have abandoned any claim that Dixit violated the 2011 Employment

Agreement or committed a tort in connection with three of those drugs: Milnacipran,

Dronedaron, and Prasugrel. Those three drugs will not be further mentioned in this opinion. To

the extent that Plaintiffs ever asserted claims with respect to those drugs, Dixit is entitled to

summary judgment dismissing them.

The three remaining pharmaceuticals relevant to this case are: Fingolimod, a generic

version of the brand-name drug Glenya; Lurasidone, a generic version of the brand-name drug

Latuda; and Methylphenidate hydrochloride extended release ("Methylphenidate"), a generic

version of the brand-name drug Concerta. (*See* Dkt. 158, 173.) Dixit generally denies having

6

worked on any of the drugs, except Methyphenidate, while at Nostrum. He admits being involved in the production of Fingolimod and Lurasidone after leaving Nostrum, but insists that they do not fall within the scope of the three-year non-compete clause quoted above.

1. Fingolimod

In his declaration, Mulye states summarily that Defendant directly worked on and had access to trade secrets related to the development of generic Fingolimod. (R. 56.1 Statement of Material Facts ISO Pls.' Mot. for Summary J. (Dkt. No. 214) ("Pls.' Rule 56.1 Statement") ¶ 22; Mulye Decl. ¶ 20.) Defendant does not dispute that, as part of Nostrum's Portfolio Management Committee ("PMC"), which considered drugs for development, Dixit helped evaluate whether to develop Fingolimod by gathering market and sales data (including health data, which Nostrum licenses from an information vendor) and patent analyses. (Def.'s Rule 56.1 Counterstatement ¶ 25.) Dixit contends that he never otherwise conducted any research or development on the product. (*Id.* ¶ 17.) Nostrum admits that it never approved for development, licensed, or entered agreements with the intention of licensing Fingolimod during Dixit's employment. (Pls.' Rule 56.1 Counterstatement ¶¶ 24, 26.)

2. Lurasidone

Mulye also summarily states in his declaration that Defendant directly worked on and had access to trade secrets related to the development of generic Lurasidone (Pls.' Rule 56.1 Statement ¶ 22; Mulye Decl. ¶ 20.) According to Plaintiffs, Nostrum employees forwarded information on the drug to various executives in 2011 and 2012,[2] Mulye asked Defendant to

---

[2] These emails have not been attached as exhibits to declarations filed in support of Plaintiffs' motion for summary judgment. The Court has no means of evaluating whether these emails, assuming they exist, suggest that Nostrum seriously considered developing a formulation of Lurasidone.

conduct a patent analysis on the product to determine if Nostrum could be the first to file an ANDA with the FDA, and Enem Pharmaceuticals acquired Active Pharmaceutical Ingredient ("API") samples and impurities for Lurasidone, so it could begin testing and development of the drug, in June 2014.[3] (Pls.' Rule 56.1 Statement ¶ 27-30.) Dixit insists that he never received emails from employees about the drug and was not asked to conduct any analysis; he also contends that he was not employed by the Company when Enem acquired the API samples. (Def.'s Rule 56.1 Counterstatement ¶ 27-30.) Nostrum admits that it never approved for development, licensed, or entered agreements with the intention of licensing Lurasidone during Dixit's employment. (Pls.' Rule 56.1 Counterstatement ¶¶ 24, 26.)

3. Methylphenidate

Plaintiffs contend that Defendant directly worked on, and had access to trade secrets related to, the development of Methyphenidate. (Pls.' Rule 56.1 Statement ¶ 22.) Dixit does not disagree that he was involved at least in some of the early steps Nostrum took toward formulating and marketing the drug. For instance, he does not dispute being involved in discussions related to FDA requirements for manufacturing the product, nor does he dispute overseeing two Methylphenidate biostudies. (Def.'s Rule 56.1 Counterstatement ¶¶ 28-32.)

Dixit does dispute Nostrum's contention that he continued working on developing a Methylphenidate product after leaving Nostrum — specifically, that he continued developing the product with ECI Pharmaceuticals through FTUG. (*Id.*) Dixit maintains that neither he nor anyone else at FTUG ever worked on developing a Methylphenidate product between October

---

[3] Nostrum does not say whether Dixit received emails from Nostrum employees containing information about Lurasidone. Presumably he was not involved in Enem Pharmaceuticals's acquisition of API samples and impurities of the drug in June 2014, since Dixit no longer worked for the Company.

8

31, 2012, when Dixit left the Company, and October 2015, when the three year non-compete period expired. According to Dixit, "it is not possible" for "a small company like" FTUG to develop generic Methylphenidate. (*Id.*)

Dixit also disputes Nostrum's contention that he improperly retained thousands of pages of emails that Defendant sent or received pertaining to Nostrum's work on Methylphenidate[4] and Nostrum's Standard Operating Procedures ("SOPs"). (Def.'s Rule 56.1 Statement ¶ 24.) Plaintiffs do not provide the Court with any details about the contents of these emails; not a single email is attached as an exhibit to a declaration in support of Plaintiffs' motion for summary judgment. Nostrum also contends that Defendant's personal computer, which contained research and development information, was given to an unknown person in India after Defendant left the Company. (Pls.' Rule 56.1 Statement ¶ 24.)

Dixit does not deny producing certain emails that he sent, received, or was copied on while working at Nostrum, but he disagrees that they contained proprietary information, noting that Nostrum has not specified what they allege the proprietary information is. (Def.'s Rule 56.1 Counterstatement Statement ¶ 24.) He also admits that he gave his computer to an unknown person in India, but contends that he did so because it was malfunctioning. Dixit conveniently says he destroyed the hard-drive first. (Def.'s Rule 56.1 Counterstatement ¶ 24.)

---

[4] Defendant also argues that certain purported trade secrets are widely known within the industry. For instance, he contends that IMS information is not a trade secret or proprietary in nature: Nostrum's proposed expert, Lynette Hilton, states in her report, dated November 12, 2015 that IMS data, used for the purpose of calculating profits "is a widely-used and commercially-available source of data for the pharmaceutical industry." (*See* Def.'s Rule 56.1 Counterstatement ¶ 25.)

9

C. Alleged Breach of the 2011 Employment Agreement

Dixit incorporated FTUG, a Florida limited liability company, on May 21, 2012. (Def.'s Rule 56.1 Counterstatement ¶¶ 14.) Dixit was still working at Nostrum at the time. FTUG listed Dixit's personal residence as its corporate address. (*Id.*)

According to Plaintiffs, Dixit began laying the groundwork for competing with Nostrum immediately after founding FTUG and while he was still working for Nostrum. Nostrum contends that Defendant travelled to India in the summer of 2012 to meet with companies with whom FTUG would later help develop and commercialize pharmaceutical products. For instance, Nostrum contends that Defendant visited Windlas Healthcare's ("Windlas's") manufacturing plant in Dehradun, India to inspect the company's facilities and determine the suitability of using its manufacturing equipment. (Def.'s Rule 56.1 Counterstatement ¶ 39.) Nostrum also contends that Dixit visited ECI Pharmaceuticals in Florida to similarly inspect their facilities for a possible partnership with FTUG. Dixit does not deny traveling to India or to Florida, but contends that he did so as part of his responsibilities at Nostrum. (*Id.*)

Plaintiffs also contend that Dixit began collaborating with others on the development of various pharmaceutical products, one of which is Methylphenidiate, before leaving Nostrum. (Pls.' Rule 56.1 Statement 35.) One of his collaborators was a former Nostrum employee, Himanshu Sud; another was a non-Nostrum employee, Paul Sudhakar (*Id.* 32.)

Dixit does not deny that he met with a potential investor, Larry Patel, before leaving Nostrum or that Patel invested $50,000 in FTUG in October 2012. (*Id.* ¶ 56.) Patel became a Managing Member and Registered Agent of FTUG on October 11, 2012, and extended FTUG a line of credit in December 2012 that resulted in FTUG receiving $200,000 that month. (*Id.*)

10

Dixit's employment at Nostrum ended on October 31, 2012. On December 18, 2012, less than two months later, FTUG entered into a Memorandum of Understanding ("MOU") with Centaur Pharmaceuticals Pvt. Ltd ("Centaur"), a pharmaceutical company based in Mumbai, for the production of Milnacipran. (Def.'s Rule 56.1 Counterstatemnt ¶ 47.) Pursuant to the agreement, Centaur was to "perform activities to support commercial manufacturing of the Product in India" and outside the United States, and would "Carry out exclusive supply of the Product to FTUG for the United States after approval of the product." (Mulye Decl. Exh. N.) The agreement also provided that Centaur would "own[] all the intellectual property related to API and the Product, if any, for the entire world," that the parties would jointly work "to file the Abbreviated New Drug Application (ANDA) in the name of FTUG," and that the parties would "share equally the net sales for the Product sale in the [United States]." (*Id.*)

On May 3, 2013, a little over six months after leaving Nostrum, FTUG entered into a MOU with Windlas for the production of Dronedarone and Prasugrel. (Def.'s Rule 56.1 Counterstatement ¶ 47; Mulye Dec. Exh. O.) Like the MOU that FTUG entered into with Centaur, the Windlas MOU provided that Windlas would carry out commercial manufacturing of the pharmaceutical products in India; that the parties would jointly prepare ANDAs in the name of FTUG; that Windlas would own all of the intellectual property related to the APIs and the products, if any, for the entire world; that FTUG would manage any patent litigation in the United States; and the parties would "share equally the net sales" for the products in the United States. (Mulye Decl. Exh. O.)

Around the same time, FTUG opened its first facility for the research, development, and manufacture of pharmaceutical products in Broomall, Pennsylvania. (Def.'s Rule 56.1 Counterstatement ¶¶ 14, 33.) In 2014 or 2015, FTUG entered into an Annexure to its May 3,

11

2013 MOU with Windlas that added Fingolimod and Lurasidone to the list of products covered by the MOU. (Mulye Decl. Exh. P.) Dixit eventually filed ANDAs for Milnacipran, Dronedarone, Prasugrel, and Fingolimod. (Def.'s Rule 56.1 Counterstatement ¶ 51.)

In May 2013, Rushi Patel, a former Nostrum employee, accepted a position at FTUG — only three months after leaving Nostrum on February 22, 2013. (*Id.* ¶ 57; DeYoung Decl. Exh. D.) According to Patel, he was not employed by Nostrum when he received and accepted FTUG's offer of employment. He does not, however, rule out the possibility that Dixit spoke to him about employment possibilities while Patel was still at Nostrum.

In May 2014, Vaibhar Pawar and Mineshkumar Patel, then employees of Nostrum, accepted positions at FTUG. (*Id.*)

Each of the employees were research scientists at NLI who had worked with Dixit. (*Id.* ¶¶ 58-59.) Nostrum contends that Rushi Patel, Pawar, and Mineshkumar Patel had access to Nostrum's SOPs and research, development, and manufacturing processes. There is some evidence to support this: Dixit does not deny, for instance, that Rushi Patel signed a "batch record" setting forth the formula for Methylphenidate that was prepared at Nostrum in April 2012. (*Id.* ¶ 58.)

D. Procedural History

This case was filed in the Supreme Court of New York and removed to this Court by notice dated December 9, 2013. On March 5, 2014, Plaintiffs filed an amended complaint containing eight counts against Dixit for: (1) breach of contract, (2) breach of the duty of good faith and fair dealing, (3) breach of trade secrets common law, (4) breach of New Jersey Trade Secrets Act, (5) breach of the Missouri Trade Secrets Act, (6) tortious interference with the Patel Agreement, (7) breach of fiduciary duty, and (8) usurping business and corporate opportunities.

12

Dixit responded on March 19, 2014 by moving to dismiss for failure to state a claim — the third motion to dismiss he filed in the case.

By order dated September 2, 2014, this Court dismissed the count for breach of duty of good faith and fair dealing as duplicative of the count for breach of contract, but otherwise denied Dixit's March 19, 2014 motion to dismiss the amended complaint. *See Nostrum Pharmaceuticals, LLC v. Dixit*, No. 13 civ. 8718, 2014 WL 4370695 (S.D.N.Y. Sept. 2, 2014) (Dkt No. 37).

On December 24, 2014, Plaintiffs filed a second amendment complaint. In the second amended complaint (the operative complaint in this case), Plaintiffs included all of the same counts as the first amended complaint, including a count for breach of duty of good faith and fair dealing, despite this Court's previous order dismissing it, as well as counts for specific performance to enforce Dixit's obligation to disclose and turnover to Plaintiffs intellectual property developed by Dixit but owned by Plaintiffs, and for violating the faithless servant doctrine.

1. The Second Motion to Dismiss

On January 12, 2015, Dixit moved to dismiss several counts in the second amended complaint and for partial summary judgment. (Dkt. No. 61.) Specifically, Dixit moved to dismiss the cause of action for breach of the duty of good faith and fair dealing based on the Court's previous order dismissing it; the third, fourth, seventh, eighth, and tenth counts of the second amended complaint based on the applicability of, and preemption by, the Missouri Uniform Trade Secrets Act (MUTSA); and the sixth count for failure to state a claim pursuant to 12(b)(6). Dixit argued that the Court now had sufficient factual basis for concluding that Missouri law

13

governs Plaintiffs' trade secret claims, based a sworn declaration signed by Dixit and a Statement of Undisputed Facts, filed pursuant to Local Rule 56.1.

In the declaration, Dixit stated that he is a Pennsylvania resident and works at FTUG in the state. He stated that he worked for Nostrum in Missouri, never conducted business in New York or New Jersey while working for Nostrum, and had never lived in New York or New Jersey. He also stated that he had lived in Florida for a period of time while he was employed by Nostrum and that he visited New Jersey once or twice in 2007, but never visited or worked out of Nostrum's New Jersey offices between 2008 and 2012. (Dkt. No. 62 Exh. 3.)

Nostrum submitted a declaration from Mulye stating that Dixit had attended meetings or conferences in New Jersey, New York, Maryland, and Florida on several occasions, frequently travelled to India, and communicated often with Nostrum personnel in New Jersey and New York. (Dkt. No. 80.)

On May 8, 2015, the Court again dismissed Plaintiffs' breach of implied covenant of good faith and fair dealing, but denied Plaintiffs' motions to dismiss counts three, four, six, seven, eight, and ten. (Dkt. No. 111.) The Court held that it did not have enough information to decide what state's law applied to the misappropriation of trade secrets claim and ruled that it would wait until discovery was completed on September 30, 2015. (*Id.*)

2. The Instant Motions for Summary Judgment

After the close of discovery, both parties filed motions for summary judgment. Plaintiffs sought partial summary judgment (1) striking Defendant's second, third, fourth, fifth, sixth, eighth, ninth, and tenth affirmative defenses, (2) declaring that Defendant breached the non-compete covenants contained in Section 8 of the 2011 Employment Agreement, (2) equitably extending the non-compete covenant for a further three-year period with respect to three

14

pharmaceutical products, and (4) enjoining Defendants from competing with respect to the three products from November 1, 2015 onward. (Dkt. No. 208.) Defendant sought summary judgment dismissing (1) Plaintiffs' breach of contract claim, (2) Plaintiffs' trade secret misappropriation claim, and (3) Plaintiffs' tortious interference, breach of fiduciary duty, usurpation and faithless servant claims, to the extent they are precluded. (Dkt. No. 211.)

## DISCUSSION

### I.    Standard For Motion to Dismiss

Summary judgment is appropriate where the parties' submissions "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, the Court must resolve all ambiguities and draw all inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

However, the non-moving party cannot establish a question of material fact by merely disagreeing with deposition testimony and documentary evidence presented by the moving party. *See Anderson*, 477 U.S. at 257. To defeat summary judgment, the non-moving party must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Thus, for the plaintiff in a discrimination case to survive a motion for summary judgment, he or she must offer "concrete particulars" to substantiate the claim. *See Meiri v. Dacon*, 759 F.2d 989 (2d Cir. 1985) *cert. denied*, 474 U.S. 829 (1985).

### II.    Breach of Contract (Count One)

The parties both move for summary judgment on Nostrum's breach of contract claims.

15

According to Plaintiffs, Defendant committed multiple breaches of the 2011 Employment Agreement in that he (1) failed to return Nostrum's confidential information, as defined by the 2011 Employment Agreements, and failed to safeguard Nostrum's confidential information, as required under the Agreement; (2) breached the 2011 Employment Agreement's covenant against competing with Nostrum in the "manufacture, distribution, marketing or sale of pharmaceutical and/or biological products in the United States" within six months of leaving Nostrum; (3) breached the 2011 Employment Agreement's covenant against soliciting Nostrum's employees and business partners within one year of leaving Nostrum; (4) breached the 2011 Employment Agreement's covenant against competing against Nostrum with regards to products "owned, developed or to be developed" by Nostrum "as to which Executive had or shall have any management, research, development, manufacturing or other responsibility at any time during his employment" within three years of leaving Nostrum. (Pls.' Mem. of Law ISO Their Mot. for Partial Summ. J., Declaratory J., and Inj. J. (Dkt No. 208) ("Pls.' Br.") at 22-26.)

According to Defendant, Nostrum has not identified any evidence showing that (1) his activities in the months preceding and following his departure from Nostrum breached the six-month non-compete covenant, (2) that his hiring of Rushi Patel violated the one-year non-solicitation covenant, (3) that he failed to assign Intellectual Property to Nostrum, and (4) that he breached the three-year product-specific non-compete clause by developing products which he research, developed, or otherwise had responsibility over while at Nostrum. (Mem. of Law ISO Def.'s Mot. for Summ. J (Dkt. No. 211) ("Def.'s Br.") at 20-27.)

The 2011 Employment Agreement is governed by New York law. It so states,

This Agreement and all rights and obligations of the Parties hereunder shall be governed by, construed, interpreted and enforced in accordance with the laws of the State of New York, applicable to agreements made and to be performed entirely within the State, including all matters of enforcement, validity and performance.

16

(DeYoung Decl. Exh. F § 21.)

To prevail on a claim for breach of contract under New York law, a plaintiff must prove (1) the existence of a contract; (2) performance by the party seeking recovery; (3) nonperformance by the other party; and (4) damages attributable to the breach." *Martinez v. Vakko Holdings A.S.*, No. 07 Civ. 3413, 2008 WL 2876529, at *2 (S.D.N.Y. Jul. 23, 2008). The parties do not dispute the existence of a contract — here the 2011 Employment Agreement. For the most part, they only disagree on whether Dixit has failed to perform his obligations under the 2011 Employment Agreement.

For the reasons stated below, Plaintiffs' motion for summary judgment on their breach of contract claim is granted in part. Defendant's motion for summary judgment dismissing the claim is denied.

A. Confidential Information

Plaintiffs first move for summary judgment on whether Defendant breached the confidentiality covenant of the 2011 Employment Agreement by failing to safeguard confidential information, as defined by Section 6 of the 2011 Employment Agreement. Specifically, Plaintiffs argue that Defendant improperly retained thousands of pages of emails containing Confidential Information related to Nostrum's development of generic Methylphenidate and Nostrum's SOPs and used them for his own benefit after leaving Nostrum. (Pls.' Br. at 22.)

Pursuant to Section 6 of the 2011 Employment Agreement, Dixit may not "use (for [his] own benefit or the benefit of others) any Confidential Information," must "return to the respective Companies all originals and copies of documents and other materials" containing such information, and must "not retain any copies thereof." (DeYoung Decl. Exh. F § 6.) As defined by the 2011 Employment Agreement, "Confidential Information" includes "any information or

17

data used by or belonging or relating to the respective Companies . . . that is not known generally to the industry in which the Companies . . . may be engaged," including "processes, procedures or standards, know-how." *Id.*

Defendant does not dispute Plaintiffs' contention that he produced in discovery thousands of pages of emails he received, sent, or was copied on while working for Nostrum. Under the clear and unambiguous meaning of the 2011 Employment Agreement, Dixit "retained" these emails after leaving Nostrum, rather than returning or deleting them.

Nonetheless, Plaintiffs are not entitled to summary judgment on this claim because they have put forward no evidence that these emails contained Confidential Information. Not a single email is attached as an exhibit to Plaintiffs' declaration in support of their motion. The only evidence in the record that the emails contained Confidential Information is (1) Mulye's declaration summarily stating that the produced emails contained Confidential Information, and (2) an email exchanged by two of Nostrum's lawyers stating that they had collected emails that *discussed* methylphenidate — not that they necessarily contained Confidential Information. (Mulye Decl. ¶ 22; Mulye Decl. Exh. H.) While a declaration from Nostrum's President is some admissible evidence of the fact that the emails contained Confidential Information, Plaintiffs have the burden of showing that there is no genuine issue of material fact as to whether Defendant retained Confidential Information after leaving Nostrum. Having failed to identify specific Confidential Information within these retained emails, Plaintiffs are not entitled to summary judgment on this claim.

B. The Six-Month Non-Compete Covenant

The parties cross-move for summary judgment on Plaintiffs' claim that Defendant violated his six-month non-compete covenant. Plaintiffs argue that Dixit violated the covenant

18

by, among other things, incorporating FTUG, meeting with investors and manufacturers, and entering into agreements to license certain pharmaceutical products from third-parties in India. Defendant argues that it is undisputed that he neither engaged in the "manufacture, distribution, marketing or sale" of pharmaceutical products nor "the conduct of marketing of molecular, chemical or pharmaceutical research, analytical or other services." (Def.'s Br. at 21.)

The six-month non-compete covenant covers a range of activities within the field pharmaceuticals. It specifically forbids Dixit from "compet[ing]" in three activities within six months of ending his employment at Nostrum: (1) "the conduct of the manufacture, distribution, marketing or sale of pharmaceutical and/or biological products in the United States," (2) "the conduct or marketing of molecular, chemical or pharmaceutical research, analytical or other services and" anywhere, and (3) "the conduct of any business competitive to any business now or at any time while [Dixit] is employed by the Companies that is engaged in by the respective Companies or any subsidiary, parent or affiliate of the Companies . . . ." (DeYoung Decl. Exh. F § 8.) The covenant defines "compet[ing]" broadly; Dixit may not "own, manage, consult with, operate, control or participate in the ownership, management, operation or control of," or "have any interest, financial or otherwise, in or act as an officer, director, partner, principal, member, manager, shareholder, proprietor, employee, agent, representative, consultant or independent contractor of," or "in any way assist any person or entity" that participates in the three proscribed activities.

Given the breadth of the six-month non-compete covenant, it is clear that Dixit breached the 2011 Employment Agreement in the months immediately following his departure from Nostrum. Dixit does not dispute that he incorporated FTUG, a company dedicated to the development and sale of generic pharmaceuticals in May 2012 while working at Nostrum. He

also does not dispute that FTUG sought and received funding from Larry Patel in October 2012, and that in December 2012, less than three months after leaving Nostrum, he entered into a MOU with Centaur through which Centaur and the Defendant, through FTUG, agreed to collaborate on selling Milnacipran hydrochloride within the United States.

Thus, well before the expiration of the six-month non-compete period, Dixit had already taken the necessary steps to "compete" with Nostrum after he left the Company, by own[ing], manag[ing], consult[ing] with, operat[ing], [or] control[ing]" a company that participated in both "the conduct of the manufacture, distribution, marketing or sale of pharmaceutical and/or biological products in the United States" and "the conduct or marketing of . . . pharmaceutical research, analytical or other services."

That Dixit did not actually begin selling generic pharmaceuticals during the six-month non-compete period is immaterial; the "conduct of the manufacture, distribution, marketing [and] sale of pharmaceutical and/or biological products," like a generic drug, begins with identifying a manufacturer of the product and seeking regulatory approval to begin selling it. Dixit had taken steps toward accomplishing both of those steps within months of leaving Nostrum by entering into the MOU with Centaur. Furthermore, the Centaur MOU indicates that he was also competing in "the conduct or marketing of . . . pharmaceutical research, analytical or other services" outside the United States, since he was aiding Centaur in the development of intellectual property for the manufacture and sale of generic drugs in India.

Defendant argues, incorrectly, that he is entitled to summary judgment dismissing the six-month non-compete claim because Nostrum had not even "considered pursuing" development of generic Milnacipran at the time FTUG entered into the MOU with Centaur for the development of the product. (Def.'s Br. at 22.) But the six-month non-compete covenant is not product-

20

specific. Rather, it broadly forbids Dixit from participating in a range of activities related to the pharmaceutical industry. For that reason, it is no defense to argue that Plaintiffs failed to show that Nostrum considered selling the product that Dixit had begun researching and developing.

Defendant also argues, incorrectly, that he is entitled to summary judgment because Plaintiffs have not shown that he exploited trade secrets or confidential information regarding Milnacipran and thus that Nostrum had a "'legitimate interest' upon which to enforce a breach of contract claim" related to a non-compete clause. (Def.'s Br. at 22.) Put differently, he argues that the six-month non-compete clause cannot be enforced because Nostrum has no "legitimate interest" in preventing Nostrum from collaborating with Centaur *in this specific instance*.

Generally, "New York courts adhere to a strict approach to enforcement of restrictive covenants because their enforcement conflicts with the general public policy favoring robust and uninhibited competition, and powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood." *Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 214 (S.D.N.Y. 2013) (citation omitted). "Accordingly, an employee agreement not to compete will be enforced only if "it is reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee." *Id.* (quoting *Scott, Stackrow & Co., C.P.A.'s, P.C. v. Skavina*, 780 N.Y.S.2d 675 (3d Dep't 2004) (citations omitted). An employer's "legitimate interests" include (1) the protection of trade secrets; (2) where the employer is exposed to "special harm" due to the "unique" nature of an employee's services; and (3) the goodwill of an employer's business. *See Ken J. Pezrow Corp. v. Seifert*, 602 N.Y.S. 2d 468 (4th Dep't 1993).

Though each of these three "legitimate interests" may apply to the case at hand, the first is sufficient to sustain the validity of the non-compete clause. In this context, trade secrets are

21

broadly defined as "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc.*, 118 F.3d 955, 968 (2d Cir. 1997) (quoting Restatement of Torts § 757 cmt. b, at 5 (1939)). Whether or not Dixit had access to specific trade secrets related to the production of Milnacipran, he cannot reasonably dispute the fact that, as Nostrum's COO and Executive Vice President responsible for formulating, testing, and manufacturing pharmaceutical products, he had access to "the compilation of information" that would give him "an opportunity to obtain an advantage over competitors who do not know or use it." Because of Dixit's position gave him so much unfettered access to Nostrum trade secrets, Nostrum had a "legitimate interest" in trying to protect those trade secrets by asking him to sign a non-compete agreement. The length and geographic area of the six-month non-compete were reasonable under New York law, *see Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 71 (2d Cir. 1999), so the non-compete clause is enforceable.

Finally, Dixit argues that he is entitled to summary judgment on Nostrum's claim for breach of the six-month non-compete covenant because Nostrum cannot show that it suffered damages as a result of his breach. The parties' expert witnesses have each submitted reports calculating damages. Though Nostrum's expert admits that calculating damages for breach of contract here is complicated, his report is enough to establish an issue for trial on the amount of Nostrum's damages, if any were sustained.

Plaintiffs are entitled to summary judgment on Defendant's liability for breaching the six-month non-compete covenant. Damages will be determined at trial.

C. The One Year Non-Compete Clause

The parties also cross-move for summary judgment on Plaintiffs' claim that Defendant breached the one year provision against soliciting Nostrum's employees and business partners. Plaintiffs argue that they are entitled to summary judgment because it is undisputed that Defendant offered employment to one of Nostrum's research scientists, Rushi Patel, in May 2013 — less than one year after Defendant left Nostrum. (Pls.' Br. at 22-23.) Dixit argues that he is entitled to summary judgment dismissing the claim, because Dixit did not breach the non-solicitation clause; according Dixit, Rushi Patel, having left Nostrum on February 22, 2013, was not "in the employ or service of either of the Companies" when he was offered a job at FTUG. (Def.'s Br. at 26.)

The 2011 Employment Agreement's non-solicitation covenant forbids Dixit from "entic[ing], induc[ing] or in any manner influenc[ing] any person who is or shall be in the employ or service of either of the Companies or any subsidiary, parent or affiliate thereof to leave such employ or service." (DeYoung Decl. Exh. F § 8.) By its own terms, the covenant applies only to employees who are working at Nostrum or those that are to begin working at Nostrum in the future.

In his deposition testimony, Rushi Patel states that he left Nostrum before receiving a job offer from FTUG. But the date of the offer is not determinative of the issue of breach. If Dixit discussed employment with Patel during the one year non-solicitation period, he breached the contract. According to his testimony, he had not had "any particular discussion for employment at First Time" but had told Dixit "at one point" after leaving Nostrum that "if any opportunity comes his way which meets my profile, let me know." (DeYoung Decl. Exh. N at 114 (R. Patel Dep); *see also* Def.'s Rule 56.1 Statement ¶ 40.) Rushi Patel's testimony is enough to establish,

23

at the very least, that there is a genuine issue of material fact as to whether he was enticed or induced or in any manner influenced to leave Nostrum for FTUG during the non-solicitation period.

To this, Plaintiff adds that Rushi Patel reported to Dixit and the two had a close relationship while Dixit was at Nostrum. They continued to see each other socially after Dixit left the Companies, and Rushi Patel admitted that he reached out to Dixit to seek an employment opportunity before he left Nostrum. Rushi Patel also began suggesting to Nostrum that he would leave the Companies around the time FTUG lined up financing from Larry Patel. (*See* Pls.' Rule 56.1 Counterstatement ¶ 40.) He began working at FTUG only three months after leaving Nostrum.

Though Nostrum's additional evidence is largely circumstantial, it helps to raise a genuine issue of material fact, particularly given how little time passed between Rushi Patel leaving Nostrum and joining FTUG. Based on this evidence, a finder of fact could determine that Dixit did in fact entice, induce, or influence Rushi Patel's departure. For that reason, Dixit's motion for summary judgment dismissing the claim is denied

D. Assignment of Rights

Dixit moves for summary judgment dismissing Plaintiffs' claim that he breached the one-year assignment of rights provision in the 2011 Employment Agreement. According to Defendant, he did not invent or develop any Intellectual Property, as defined by the provision, within one year of his departure from Nostrum. (Def.'s Br. at 24-25.)

Plaintiffs, in opposing Defendant's motion, argue that Defendant did, in fact, invent Intellectual Property within a year of leaving Nostrum, since he collaborated with Sud, Sudhakar,

24

and ECI Pharmaceuticals on developing a Methylphenidate product that was either a copy or derivate of prior formulations of the drug that Dixit had worked on while employed for Nostrum.

Section 5 of the 2011 Employment Agreements states that "the Companies shall become the owner" of "all inventions, discoveries, developments, ideas, writings, and expressions," including "improvements," "know-how," "innovations," "current or proposed products," and "methods of manufacture," that (1) "directly or indirectly relates to or arises out of Executive's job responsibilities" at Nostrum, (2) "results from research, development, or other activities of such Companies," or (3) "relates or pertains in any way to the existing or reasonably anticipated scope, business or products" at Nostrum. (DeYoung Decl. Exh. F § 5.)

Though Dixit denies working on the development of a generic Methylphenidate product after leaving Nostrum — stating, specifically, that a company like FTUG was too small to pull off such a feat — Nostrum has raised a genuine issue of material fact as to whether Dixit developed a formulation of Methylphenidate, derived from Dixit's work at Nostrum, that did not infringe the name-brand drug manufacturer's patent. Nostrum quotes emails exchanged by Dixit, Sud, and Sudhaker in July, September, and October 2012 — after the incorporation of FTUG but before Dixit left Nostrum — in which they discuss whether an ANDA for Methylphenidate could be filed within 12 months. Nostrum also references an email in which they exchange a specific document that summarizes a strategy for producing a non-infringing formulation of generic Methylphenidate. (Pls.' Opp'n Br. at 7.) Nostrum also discusses an October 9, 2012 email in which Sud sends representatives of ECI Pharmaceuticals a "brief [Paragraph IV] strategy for [Methylphenidate] Concerta" — perhaps the same document — and mentions, among other things, that Defendant had conducted a pilot study and was in discussion with multiple parties to license the agreement. Nostrum also contends that Dixit visited ECI Pharmaceuticals to inspect

25

their manufacturing equipment. According to Nostrum, Dixit did not disclose the formulation being discussed in the email, nor was it ever assigned to the Companies. (*Id.*)

Nostrum's selective quoting of emails between Dixit, Sud, and Sudhaker makes it difficult to discern whether Dixit was developing a generic Methylphenidate product for FTUG or for Nostrum; after all, Dixit does not deny that he performed work on such a product for Nostrum and the emails quoted by Plaintiff were sent or received before he left the Companies. Regardless, the emails are some evidence that Dixit developed a formulation of Methylphenidate within the time frame covered by the assignment of rights covenant that was not disclosed or assigned to the Companies. Because Dixit admits that his Nostrum responsibilities included overseeing the development of a generic Methylphenidate formulation, this work — which easily falls within the broad definition of "Intellectual Property" in the assignment of rights clause — "directly or indirectly relates to or arises out of Executive's job responsibilities" at Nostrum and may also "result[] from research, development, or other activities of such Companies." (*See* DeYoung Decl. Exh. F § 5.)

Because Plaintiffs have raised a genuine issue of material fact as to whether Dixit developed a generic Methylphenidate formulation that was not assigned to the Company, Defendant's motion for summary judgment dismissing Plaintiffs' claim related to the assignment of rights covenant is denied.

E. The Three-Year Product Specific Non-Compete Covenant

The parties also cross-move for summary judgment on Dixit's breach of the three-year, product-specific non-compete clause. According to Nostrum, Dixit breached the covenants by continuing to work on a formulation of generic Methylphenidate through January and February 2013, and also by working with Windlas to launch generic Fingolimod and Lurasidone. (Pls.' Br.

26

at 24-25.) According to Defendant, the Company has not produced no evidence showing that any drug, besides Methylphenidate, was "owned, developed or to be developed" by Nostrum while he worked there or that he or any other employee at FTUG worked on developing a generic version of Methylphenidate after he left Nostrum.

The three-year non-compete covenant bars Defendant from competing with Nostrum "in respect of any products owned, developed or to be developed by either of the Companies or its affiliates as to which Executive had or shall have any management, research, development, manufacturing or other responsibility at any time during his employment with either of the Companies." Under the 2011 Employment Agreement's broad definition of competing, Dixit may not "own, manage, consult with, operate, control or participate in the ownership, management, operation or control of," or "have any interest, financial or otherwise, in or act as an officer, director, partner, principal, member, manager, shareholder, proprietor, employee, agent, representative, consultant or independent contractor of," or "in any way assist any person or entity" that participates in the a proscribed activity.

There are numerous genuine issues of material fact that preclude granting either party's motion for summary judgment. Nostrum admits that the Company never approved for development or licensed Fingolimod and Lurasidone during Dixit's employment. (Pls.' Rule 56.1 Counterstatement ¶¶ 24, 26.) However, nothing in the 2011 Employment Agreement requires a pharmaceutical to have been approved for commercial use before the three-year non-compete covenant applies to an employee involved with its development. The clear meaning of the words "to be developed" suggests that even the most preliminary steps in developing a product are enough for Dixit to fall under the covenant. Nostrum has raised a genuine issue of material fact as to whether the drugs were "to be developed" by establishing that they took *some*

27

steps towards developing Fingolimod and Lurasidone; Nostrum's PMC evaluated Fingolimod for development and Dixit gather market and sales data and patent analyses on the drug (Def.'s Rule 56.1 Counterstatement ¶ 25), and Nostrum conducted a patent analysis on Lurasidone to determine if Nostrum could be the first to file an ANDA (Pls.' Rule 56.1 Statement ¶ 27-30).

Similarly, the parties disagree about the extent to which Dixit had "any management, research, development, manufacturing or other responsibility" as toward those drugs "at any time during his employment." Dixit denies having any responsibility for the products, despite holding a position in which he oversaw all research and development at the Missouri facility. However, Nostrum contends that Dixit helped evaluate whether the Companies should develop both drugs; Nostrum says Dixit gathered market and sales data for Fingolimod and Mulye states in his declaration that he directed Defendant to conduct a patent analysis on the product to determine if Nostrum could be the first to file an ANDAs. The evidence creates a genuine issue of material fact as to whether Dixit was at all responsible for those drugs while at Nostrum.

Dixit does not argue in his brief that he did not compete with Nostrum in the development of Fingolimod and Lurasidone within three years of leaving Nostrum. Just as he "competed" with Nostrum in the development of Milnacipran hydrochloride by signing an MOU with Centaur, he "competed" with Nostrum in the development of Fingolimod and Lurasidone by singing a MOU with Windlas. Dixit also does not argue that a generic Methylphenidate formulation was "owned, developed or to be developed" by Nostrum and that he had "management, research, development, manufacturing or other responsibility" over its development. (Def. Br. at 25.) Dixit only disputes, again, that FTUG sought to develop generic Methylphenidate after he left Nostrum. (*Id.*) But as explained above, Nostrum has raised a

28

genuine issue of material fact as to whether Dixit was developing a generic Methylphenidate product.

The parties' cross-motions for summary judgment on Plaintiffs' claim for breach of the three-year non-compete covenant are denied.

F. Equitable Extension of the 2011 Employment Agreement's Non-Compete Clause (Count 10)

Plaintiffs argue that they are entitled to equitable relief extending the three-year non-compete clause past their three-year October 31, 2015 expiration. They contend that, absent an injunctive, they will suffer irreparable harm that cannot be remedied by a monetary award. (Pls.' Br. at 28.) Plaintiffs' argument has no merit.

Restrictive covenants are disfavored because of the "powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood" as well as the "general public policy favoring robust and uninhibited competition." *Ashland Mgmt. Inc. v. Altair Investments NA, LLC*, 869 N.Y.S.2d 465, 471 (2008). Restrictive covenants are unenforceable under New York law unless reasonable in scope, duration, and geographic area. *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 389 (1999).

Plaintiffs' proposed equitable three-year extension is not reasonable, given its duration and geographic area. "With agreements not to compete between professions," the Court of Appeals of New York has "given greater weight to the interests of the employer in restricting competition within a confined geographical area." For instance, the Court of Appeals sanctioned a five year restraint on competition in *Gelder Med. Group v. Webber*, 41 N.Y.2d 680, 394 (1977), but only because the covenant covered a limited, rural locale. Here, Plaintiffs seek to extent a non-compete covenant for *another* three years — restricting Defendant's conduct for a total of six years — without any geographic limitation, since the 2011 Employment

29

Agreement's three-year non-compete covenant is not limited to a city, state, or even a country. A six-year non-compete covenant that bars Dixit from producing pharmaceuticals anywhere in the world, even if limited to those products he developed at Nostrum, is beyond what New York law tolerates. *See, e.g., Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 220 (S.D.N.Y. 2013) (one-year restriction on producing pharmaceuticals within New York metropolitan area upheld, where geographical restriction narrower than Defendant's service area); *Battenkill Veterinary Equine v. Cangelosi*, 768 N.Y.S.2d 504 (3d Dep't 2003) (three-year, 35–mile restriction on practicing equine veterinary medicine upheld, where geographical restriction narrower than veterinarian's service area).

## III.    Misappropriation of Trade Secrets (Counts Three, Four, and Five)

Defendant seeks summary judgment on Plaintiffs claims against Dixit for misappropriation of trade secrets under New York common law (Count Three), the New Jersey Trade Secret Act (Count Four), and the Missouri Trade Secrets Act (Count Five).

The 2011 Employment Contract is governed by New York Law. Because New York does not permit the same conduct to be assigned as both a breach of contract and a tort, Plaintiffs' misappropriation of trade secrets claims, which duplicate their breach of contract claim, must be dismissed. *See Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 58 (2d Cir. 2012); *Fixed Income Shares: Series M v. Citibank N.A.*, No. 14-CV-9373 JMF, 2015 WL 5244707, at *13 (S.D.N.Y. Sept. 8, 2015).

Section 6 of the 2011 Employment Agreement expressly states that Dixit "owes a duty to the Companies not to disclose" Confidential Information. (DeYoung Decl. Exh. F § 6.) Moreover, it requires Dixit not to "communicate, publish or disclose to any person or entity anywhere or use (for Executive's own benefit or the benefit of others) any Confidential Information (as defined below) for any purpose other than carrying out Executive's duties as

30

contemplated by this Agreement." (*Id.*) As stated above, the 2011 Employment Agreement defines Confidential Information incredibly broadly as,

> any information or data used by or belonging or relating to the respective Companies . . . that is not known generally to the industry in which the Companies . . . may be engaged, including, without limitation, any and all trade secrets, proprietary data and information relating to . . . past, present or future business and products, price lists, customer lists, processes, procedures or standards, know-how, manuals, hardware, software, source code, business strategies . . . whether or not reduced to writing . . . . Confidential Information does not include any information that: . . . (ii) is or later becomes part of the public domain and known within the relevant industry through no fault of Executive.

(*Id.*)

The 2011 Employment Agreement's definition of "Confidential Information" encompasses all of the "trade secrets" that Defendant purportedly misappropriated. According to Plaintiffs, the misappropriated trade secrets include: for Fingolimod, Lurasidone, "Nostrum's formulations, research and data results and market data, including market analyses and costs" and "legal research" concluding "that the two drugs were viable development candidates" (Pls.' Opp'n Br. at 14); and for Methylphenidate, "formulation information, internal research and data results, manufacturing information, including equipment information, legal analyzes and sales and cost information from bio-studies conducted on the product" (*Id.* at 15.) Viewing Plaintiffs' contentions in the most favorable light, this is "information or data used by or belonging or relating to the respective Companies . . . that is not known generally" within the pharmaceutical industry." The same conduct that gives rise to a breach of the 2011 Employment Agreement would have to comprise a claim for misappropriation as well.

Moreover, as discussed above, Plaintiffs have already asserted a breach of contract claim against Defendant for violating Section 5 of the 2011 Employment Agreement — in large part for the same conduct that forms the basis of their trade secret misappropriation claims. In arguing that Dixit had breached the covenant not to disclose Confidential Information, Nostrum argued

that Dixit retained emails containing Confidential Information related to the development of generic Methylphenidate and Nostrum's SOPs and used the Confidential Information for his own benefit after leaving Nostrum. (Pls.' Br. at 22.)

Under New York law, a breach of contract will not give rise to a tort claim unless a legal duty independent of the contract itself has been violated. *Bayerische Landesbank*, 692 F.3d at 58. "Such a 'legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent on the contract.'" *Id.* (quoting *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 389 (1987)).

Here, Plaintiffs have not alleged the violation of a legal duty independent of the contract. The contract gives rise to a duty not to "communicate, publish or disclose" Confidential Information or use such information "for Executive's own benefit or the benefit of others." The same circumstances that would give rise to a breach of this covenant would give rise to a tort for misappropriation of trade secrets. Plaintiffs trade misappropriation claims are duplicative of their breach of contract claims and must be dismissed as a result.

Plaintiffs' claim for misappropriation of trade secrets is based on Confidential Information related not just related to Methylphenidate, but also to Fingolimod Lurasidone. Because the Court sustained Plaintiffs' claim and reserved its resolution for trial, Plaintiffs will be able to argue to the jury that Defendant's retention and use of Confidential Information related to all three drugs constituted a breach of the 2011 Employment Agreement.

## IV. State Law Claims (Counts Six, Seven, Eight, and Ten)

Defendant also seeks summary judgment dismissing Plaintiffs' New York state law claims for tortious interference (Count 6), breach of fiduciary duty (Count 7), usurpation of business and corporate opportunities (Count 8), and the "faithless servant" doctrine (Count 10)

32

on various grounds. Defendant's motion for summary judgment dismissing these claims is denied.

A. Tortious Interference (Count 6)

Plaintiffs contend that Defendant intentionally interfered with Nostrum's contractual relationships with Rushi Patel, Mineshkumar Patel, and Pawar by inducing them to terminate and breach the confidentiality and non-compete provisions of their Nostrum employee agreements. Though Plaintiffs have not provided copies of Rushi Patel's, Mineshkumar Patel's, or Pawar's employment agreements, it is undisputed that all three were former Nostrum employees presumably subject to confidentiality and non-compete covenants identical to Dixit's. (Def.'s Rule 56.1 Counterstatement ¶ 57.) FTUG hired Rushi Patel before May 2013 and hired Mineshkumar Patel and Pawar in May 2014. (*Id.*)

Defendant moved for summary judgment on Nostrum's claim for tortious interference, on the grounds that (1) Rushi Patel, without Defendant's knowledge, hired Mineshkumar Patel and Vaibhav Pawar in 2014, and (2) nothing in the record suggests that Mineshkumar Patel or Vaibhav Pawar breached their confidentiality covenants by retaining Nostrum's Confidential Information and bringing it with them to FTUG. Defendant's motion for summary judgment does not address whether he tortiously interfered with Plaintiffs' contractual relationship with Rushi Patel.

As the Court stated in its opinion denying Defendant's motion to dismiss,

In New York, to state a claim for tortious interference with contract, a plaintiff must allege: (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom.

33

*Nostrum Pharmaceuticals*, 2014 WL 4370695, at* 12 (quoting *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006)). Defendant does not appear to dispute the existence of valid contract agreements for Mineshkumar Patel and Pawar, or that they breached the non-compete clauses of their contract agreements. He only contends that Plaintiffs have not established that he knew of the contracts when the parties were hired, that he intentionally induced the breaches, and that damages resulted.

The extent to which Defendant knew Rushi Patel had offered employment to Mineshkumar Patel and Pawar and intended them to breach the non-compete covenant of their Nostrum employment contracts are issues of fact to be determined by the fact finder. FTUG was a small company with only a few employees. Given the size of the company and Rushi Patel's short tenure there, it is fair to presume that Defendant was aware of all new potential hires and had to sign off on all offers Rushi Patel made. Moreover, having signed three Nostrum employment agreements himself, Defendant was presumably well-aware of the sort of non-compete covenants that Mineshkumar Patel's and Pawar would have been subject to in their Nostrum employment agreements. Because Dixit does not dispute that Mineshkumar Patel and Pawar breached the non-compete clauses of their contract agreements, the Court need not determine at this time whether they also breached the confidentiality covenants.

Defendant argues that the only damages related to tortious interference that Nostrum's expert identified in his report stem from the delay in product development and filings for regulatory approval caused by the loss of research and development personnel. Defendant has cited no case law holding that this is not a cognizable injury.

34

Making all presumptions in favor of the non-movants, as the Court must, the record gives rise to a genuine issue of material fact as to Plaintiffs' tortious interference claim. Defendant's motion for summary judgment dismissing it is denied.

B.  Breach of Fiduciary Duty (Count 7)

Defendant also seeks summary judgment dismissing Plaintiffs' breach of fiduciary duty claim. According to Plaintiffs, Dixit had a duty "to disclose his divided loyalty and secretive competitive activities," specifically his loyalty to FTUG and his secretive work on pharmaceutical development projects with Sud, Sudaker, Windlaw, Centaur, and ECI Pharmaceuticals. (Pls.' Opp'n Br. at 25.) Defendant argues that he had no such duty, because he was not an officer when he incorporated FTUG, having been demoted in November 2011. (Def.'s Br. at 28.)

As stated above, New York law generally bars a cause of action in tort where it is duplicative of a claim sounding in contract. *Bayerische Landesbank*, 692 F.3d at 58; *see also Snyder v. Wells Fargo Bank, N.A.*, 594 F. App'x 710, 712 (2d Cir. 2014). An actionable tort may only exist when the plaintiff asserts that the defendant breached a legal duty that is independent of the contract. This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract. *Bayerische Landesbank*, 692 F.3d at 58.

"Under New York law, an employee owes a duty of good faith and loyalty to his employer." *Design Strategy, Inc. v. Davis*, 469 F.3d 284 (2d Cir. 2006). This duty includes the "corollary duties of an agent to disclose information that is relevant to the affairs of the agency entrusted to him and to refrain from placing himself in a position antagonistic to his principal concerning the subject matter of his agency." *Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 227

35

(S.D.N.Y. 2013). While "an employee is not prohibited from making arrangements or preparations to compete with his principal before terminating his agency," he may not "act unfairly or injure his principal." Thus, in *Poller v. BioScrip*, a former employee of a pharmaceutical company breached her duty of loyalty to the company by taking confidential and proprietary information obtained during the course of her employment and using it for her own benefit at her next position. *Id.* at 230.

As in *Poller*, Dixit had a duty of loyalty to the Company — even though he was no longer an officer or director — independent of the terms of his employment contract. That duty of loyalty encompassed a duty to disclose his creation of FTUG — information that could have been "relevant to the affairs of the agency" — and not to pilfer confidential and proprietary information he obtained during his employment at Nostrum. *See Poller*, 974 F. Supp. 2d at 204. Because Dixit had a duty of loyalty to the Company and because this duty "exists independent of any contract between the parties to refrain from such conduct," Plaintiffs' motion for summary judgment dismissing the claim is denied.

C. Usurpation of Corporate Opportunities (Count 8)

Defendant also seeks summary judgment dismissing Plaintiffs' state usurpation of corporate opportunities claim based on the "uncontroverted fact" that Defendant was not offered any business opportunity and Nostrum has not identified a "tangible expectancy" with regard to any product but Methylphenidate during Defendant's employment at Nostrum.

The doctrine of "corporate opportunity" is "based on a duty of loyalty to an employer" and provides that "corporate fiduciaries and employees cannot, without consent, divert and exploit for their own benefit any opportunity that should be deemed an asset of the corporation." *Dorset Indus., Inc. v. Unified Grocers, Inc.*, 893 F. Supp. 2d 395, 413 (E.D.N.Y. 2012); *see also*

36

*Alexander & Alexander of New York, Inc. v. Fritzen*, 542 N.Y.S.2d 530 (1st Dep't 1989). As stated above, this duty of loyalty is independent of any duty created by the 2011 Employment Contract and is not duplicative of Plaintiffs' breach of contract claim.

New York courts have used various methods for determining whether a venture should be considered a "corporate opportunity." One frequently used method is whether the corporation has an "interest" or "tangible expectancy" in the alleged opportunity. *Alexander & Alexander*, 542 N.Y.S.2d at 534. "An 'interest' or 'tangible expectancy' has been explained as something 'much less tenable than ownership,' but, on the other hand, more certain than a 'desire' or a 'hope.'" *Id.* As described by the Second Circuit, the doctrine should only prevent employees from acquiring "property which the corporation needs or is seeking, or which they are otherwise under a duty to the corporation to acquire for it." *Burg v. Horn*, 380 F.2d 897, 899 (2d Cir. 1967). Another method has been to inquire into whether, at the beginning of the employment or fiduciary relationship, "the parties understood, or it is reasonable to conclude that the parties understood, that the employee, officer or director would simultaneously pursue other interests, even ones related to or in direct competition with the business of the corporation." *Alexander & Alexander*, 542 N.Y.S.2d at 534 (citing *Burg v. Horn*, 380 F.2d at 899).

As discussed above, Plaintiffs have raised a genuine issue of material fact as to whether Dixit conspired with Sud and Sudhaker to develop a generic Methylphenidate formulation that was not assigned to the Company while he was still employed by Nostrum. Dixit does not dispute that the Companies were also working on a generic formulation of the drug, suggesting that a successful formulation was "property which the corporation needs or is seeking" and that, as an employee responsible for overseeing research and development, Dixit was "under a duty to the corporation to acquire for it." *See Burg v. Horn*, 380 F.2d at 899. Moreover, considering that

37

Dixit was subject to an express assignment clause under the 2011 Employment Agreement, it is unreasonable to assume that the parties understood "that the employee, officer or director would simultaneously pursue other interests, even ones related to or in direct competition with the business of the corporation." *See id.* There is some evidence, then, that Dixit usurped a "corporate opportunity." Defendant is not entitled to summary judgment dismissing Plaintiffs' usurpation claim as a result.

D. Faithless Servant Claim (Count 10)

Finally, Defendant seeks summary judgment dismissing Plaintiffs' faithless servant claim on the sole basis that the claim is duplicative of Plaintiffs' corporate opportunity claim.

Unlike Plaintiffs' corporate opportunity claim, which requires a showing of actual damages, Plaintiffs need not show that it "suffered . . . provable damage as a result of the breach of fidelity by the agent" to prove a violation of New York's faithless servant doctrine. *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 524–25 (S.D.N.Y. 2011). Moreover, Plaintiffs may recover the compensation it paid for the "time period of disloyalty," rather than normal consequential damages as a result of Plaintiffs' breach of the contract. *See Design Strategy, Inc. v. Davis*, 469 F.3d 284, 301 (2d Cir. 2006).

Because the elements of the claim and prospective damages are different than in a breach of contract claim, Plaintiffs' faithless servant claim is not necessarily duplicative of Plaintiffs' claims. Defendant has certainly not shown that he is entitled to summary judgment dismissing it as a result.

## V.    **Defendant's Affirmative Defenses**

In his Answer to the Second Amended Complaint (Dkt. No. 38), Defendant asserted ten affirmative defenses: (1) failure to state a claim upon which relief may be granted, (2) unclean hands, (3) illegality, (4) prior material breach of the employment contract, (5) doctrine of

38

estoppel, (6) doctrine of waiver, (7) statutory preemption under the Missouri Trade Secret Statute, (8) failure to establish damages or to mitigate damages, (9) doctrine of frustration, and (10) the failure of express and implied conditions precedent to the statutory provisions.

The first affirmative defense was addressed in the Court's prior order denying Defendant's motion to dismiss. The rest of Defendants' affirmative defenses can be stricken.

A. Unclean Hands

Defendant's unclean hands affirmative defense is based on its contention that the Companies "illegally transported and shipped a controlled substance to India for the purpose of conducting bioequivalence studies and laboratory testing involving the generic form of [methylphenidate]."

However, "If the alleged misconduct is unrelated to the claim to which it is asserted as a defense, [it] does not constitute unclean hands." *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 842 F. Supp. 2d 682, 713 (S.D.N.Y. 2012) (citation omitted). Whether or not Nostrum illegally transported a controlled substance to India is irrelevant to the subject of this litigation: whether Defendant breached his employment contract. Because the misconduct Defendant alleges "stems from actions taken outside the bounds of that contract," it is irrelevant and no defense to Plaintiffs' claims. *Id.*

B. Illegality

Similarly, Defendant's illegality defense is based on its contention that the Companies engaged in illegal acts and performance under the 2011 Employment Agreement would have required him to as well.

But for a contract to be illegal and enforceable, the very purpose of the contract must be to accomplish an illegal act. *Warden v. ER Squibb & Sons, Inc.*, 840 F. Supp. 203, 206, 208-09

39

(E.D.N.Y. 1993). Defendant does not contend that the purpose of the 2011 Employment Agreement was to effectuate illegal acts. Though he contends that performance under the agreement would have required him to submit false and misleading evidence to the FDA, he does not contend that the terms contract required him to do so — he could have refused and still performed adequately under the express terms of the Agreement. Under New York Law, only contracts whose performance requires illegal conduct are voidable. *Omega Overseas Partners, Ltd. V. Griffith*, 2014 WL 3907082, at \*3 (S.D.N.Y. Aug. 7, 2014). That is not the case here.

Alternatively, Dixit contends that the non-compete covenants are unenforceable and unreasonable as contrary to New York law and public policy. (Dkt. No. 114 at 16.) He is wrong. The 2011 Employment Contract's non-compete covenants are narrowly tailored enough to pass muster. As discussed above, Plaintiffs had a "legitimate interest" upon which to enforce a breach of contract claim. While the three-year product-specific non-compete covenant touches on the outrebounds of what is permissible under New York law, it is not unreasonably long in time or duration, considering that it is narrowly tailored to only restrict Defendant's work on products he helped develop while at Nostrum. Because it covered a small number of products, Dixit was not completely restricted from finding new employment within the pharmaceutical market. Non-compete clauses of similarly length have been found reasonable where their geographic restriction does not preclude a professional from working. In *Battenkill Veterinary Equine*, 768 N.Y.S.2d at 506, for instance, a New York court upheld a three-year non-compete clause as reasonable where it applied only to geographical restriction that was narrower in scope than the veterinarian's usual service area. Under the non-compete clause, she could continue to service clients.

Plaintiff is entitled to summary judgment striking Defendant's third affirmative defense.

C. Prior material breach of the employment contract

Defendant contends that Plaintiffs were first to breach the 2011 Employment Contract by "demanding that Dixit violate applicable law or engage in unethical activity as a condition of his continued employment," and thus breaching the implied covenant of good-faith and fair dealing. (Dkt. No. 11 at 17.)

Defendant's affirmative defense fails as a matter of law. First, "When a party materially breaches a contract, the non-breaching party must choose between two remedies — [electing] to terminate the contract and recover liquidated damages or [continuing] the contract and recover[ing] damages solely for the breach." *ESPN, Inc. v. Office of Com'r of Baseball*, 76 F. Supp. 2d 383, 398 (S.D.N.Y. 1999). By continuing to collect a paycheck from Nostrum until the expiration of the 2011 Employment Agreement, Defendant forfeited the right to complain about Plaintiffs' alleged prior breach.

Second, the implied covenant of good faith and fair dealing is only implicated where an action denies or injures the contracted rights of the other party. Here, Defendant does not contend that he was deprived any bargained for benefit—namely, compensation.

D. Doctrine of estoppel and waiver

Defendant contends that he informed Plaintiffs' management that he intended to leave Nostrum at the expiration of the 2011 Employment Agreement to file ANDAs on behalf of companies in India. He says he was assured by Mulye that this conduct would not be considered a breach of the restrictive covenant and that the covenants would not be enforced.

This is no defense to a claim of breach of contract.

First, the 2011 Employment Contract states that it "shall not be amended, modified or supplemented in any manner whatsoever except as otherwise provided herein or in writing

41

signed by each of the Parties herein." (DeYoung Decl. Exh. F § 14.) Oral modifications to the

agreement are therefore not enforceable.

Second, the Agreement states that a partial waiver shall not be a complete waiver of the

Companies' rights; according to the 2011 Employment Agreement,

> "Failure of either Party to demand strict compliance with any of the terms, covenant or
> conditions hereof shall not be deemed a waiver of the terms, covenant or condition, nor
> shall any waiver . . . at any one time or more times be deemed a waiver or relinquishment
> of the right or power at any other time or times."

(*Id.*) Thus, a partial waiver of the non-compete covenant does not completely shield Defendant

from Plaintiffs' claims.

E. Statutory preemption under the Missouri Trade Secret Statute

For the reasons stated above, Plaintiffs' misappropriation claims are duplicative of their

breach of contract claims. Accordingly, there are no non-contractual claims related to

misappropriation of trade secrets for MTUSA to preempt.

F. Doctrine of frustration

Defendant next states that the Companies' decision to "engage in illegal and/or unethical

conduct that would subject them and Dixit to potential criminal prosecution and/or professional

debarment . . . completely frustrated the purpose of the 2011 employment agreement."

Frustration of purpose refers to a situation where an unforeseen event destroys the

underlying reasons for performing a contract. Even though performance is possible, a party's

duty to perform is discharged. *Bank of America v. Envases Venezolanos, SA*, 740 F. Supp. 260,

265-67 (S.D.N.Y. 1990). By continuing to receive a paycheck from Nostrum until the expiration

of the 2011 Employment Agreement, Defendant forfeited the right to complain about the purpose

of the Agreement being frustrated.

42

G. The Failure to Establish Damages or to Mitigate Damages and the Failure of Express
   and Implied Conditions Precedent to the Statutory Provisions

Defendant's final two affirmative defenses fail because he has not identified a condition

precedent nor produced evidence showing that Plaintiff failed to mitigate damages. To the extent

Defendant contends that Plaintiffs have failed to establish damages, the jury will decide.

## CONCLUSION

For the foregoing reasons, Plaintiffs' and Defendant's motions for summary judgment are

granted in part and denied in part. The Clerk of the Court is directed to remove Docket Numbers

205 and 210 from the Court's list of pending motions.

Dated: September 23, 2016

_Bill M. Mal_

U.S.D.J.

BY ECF TO ALL COUNSEL

43